[No. 2271.]

## JAMES O. PHILLIPS *v.* THE STATE.

1. PRACTICE—EVIDENCE.—Trial courts are authorized to admit apparently immaterial testimony, upon the assurance of the party offering it that its materiality will be shown by other evidence, to be introduced at a subsequent stage of the trial. The failure of such party, however, to produce such qualifying evidence imposes upon the trial court the duty of withdrawing the immaterial evidence from the jury and instructing them to disregard the same.

2. SAME—MURDER.—As against the husband, upon trial for the murder of his wife, it is competent for the State to show, as a motive on the part of the husband to commit the crime, the infidelity of the wife, provided it be shown that the husband knew of his wife's infidelity at the time of the killing. Otherwise, proof of the deceased's want of virtue would be immaterial and inadmissible. See the statement of the case for evidence *held* insufficient to establish the defendant's knowledge of the infidelity of the deceased at the time of the murder. Wherefore the trial court, having admitted evidence of the deceased's infidelity, upon the assurance of the State's counsel that evidence showing the defendant's knowledge would be produced, should have withdrawn the proof from the jury and instructed them to disregard the same.

3. SAME—THREATS.—Upon the trial of the defendant for the murder of his wife, two State's witnesses were permitted to testify that, in a casual conversation, prior to the murder, and not involving the discussion of his wife, the defendant said that if he knew his wife to be unfaithful to him he would kill her and himself too. *Held*, that the threats were not only conditional, but, in view of the evidence in the case, were irrelevant and immaterial, and, in view of the failure of the State to establish in the defendant knowledge of his wife's infidelity at the time of the killing, they were inadmissible upon the question of motive.

4. SAME.—See the opinion *in extenso* for circumstances under which the refusal of the trial court to compel the State to introduce a certain witness in the case was not an abuse of judicial discretion—there being nothing to indicate that he knew anything material.

APPEAL from the District Court of Travis. Tried below before the Hon. A. S. Walker.

The indictment in this case charged the appellant with the murder of his wife, Eula Phillips, in the city of Austin, Travis county, Texas, on the night of December 24, 1885. His trial resulted in his conviction of murder in the second degree, and his

punishment was assessed at a term of seven years in the State penitentiary.

Mrs. James Phillips, the defendant's mother, was the first witness for the State. She testified that the defendant, his wife, (the deceased), and his infant, from October, 1885, until the fatal night, December 24, 1885, occupied a room in the house of the witness and her husband, the defendant's father, on West Hickory street, in the city of Austin. Witness last saw the deceased alive about eleven o'clock, on the night of December 24. She was then in bed with her husband and child in her room in the witness's house. The bed stood north and south against the wall, in the southwest corner of the room. Deceased lay behind, next to the wall, and was then laughing and talking with defendant and their child. The child lay between the two on the defendant's arm, the hand of which was resting on the deceased's head. The defendant and the deceased lay facing each other. The purpose of the witness's visit to the room was to take in some candies and nuts, and to get the defendant to show her how to manipulate a toy she designed as a Christmas present to a grand child.

In order to reach the room occupied by the defendant and the deceased, the witness, going from her room, had to cross an intervening gallery. The door to defendant's room opening on the gallery was secured by a bolt—not a lock—which could be sprung from either the inside or the outside. A bureau stood on the east side of the room, against the wall, and immediately opposite the foot of the bed. A lamp was burning on the left hand side of the bureau. There was a window about opposite the right hand corner of the bureau, another in the northwest corner of the room, and a door and window opened to the ground on the west side of the room. There was a lock to the door but no key. The door was closed, and there was a warming stove so near it that it would open far enough only to admit a person passing in sideways. A small table stood near the head of the bed. The room was small, not exceeding twelve by fourteen feet in size.

An hour and a half later, or at about half past twelve o'clock, the witness again visited the defendant's room. His wife, Eula, the deceased, was then gone; his child was sitting up in the bed, crying, and the defendant was lying down in the middle of the bed, wounded, and waving his hands frantically over his head. An axe lay in the bed, in front, and along side the defendant,

the blade resting near his hips and the handle pointing towards his feet. The axe lay on the sheet and the handle was somewhat bloody. The bed cover was drawn up to the defendant's waist, and was rolled around him. His pillow was saturated with blood. The pillow on which Eula's head had reposed had a very little blood on it on that end next to the defendant. Blood had run lengthwise of the defendant on the bed, and thence to the floor. The blood ran to a point not quite but nearly in the middle of the bed, or about where the hips of the defendant lay, and thence through or off the bed to the floor. The end of the axe handle rested about one foot from the foot board of the bed. There was but little blood on Eula's pillow, and none on the bed on the side occupied by her. There was some blood on the axe handle. It did not run on to the axe handle, but was put on it by some one, perhaps by the witness when she removed it from the bed. That axe belonged to the witness's husband, and was usually kept at the wood house, about thirty feet from the defendant's back door, and not far from the point where the body of the deceased was found. The witness did not know whether or not the defendant knew where that axe was usually kept. He did not keep his wood with that of the witness. The pillow used by the defendant on that night, being rendered by the blood unfit for further use, was burned. If any thing else was burned witness did not know it.

The witness's mind was so distraught by the agonies of that tragic night that she could not now be exact as to all of the particulars that came under her view. It was, however, her present recollection that there were no distinct foot marks or tracks in the house. She stated on the defendant's examining trial that she saw two tracks in the room, one pointing, she thought, towards the door of the room, and the other towards the head of the bed, and that this last was partly under the bed. Further examination, however, rendered the witness uncertain, and she was still uncertain, whether or not those stains are impressions of a human foot. Being asked directly whether there were bloody tracks in the defendant's room, by his bed, the witness answered: "I saw one track by the foot of the bed, but went back and could not tell which way the toes pointed. I also saw what I thought was another track, but on subsequent search I could not find it." There were bloody tracks on the gallery. The track in the room,—if it was a track, of which witness was doubtful,— was at the side and rather under the bed, near the foot, pointing

towards the head of the bed.   If a track at all, it was a flat
track and showed no toes.   All the tracks about the premises,
examined or seen by the witness were tracks of bare feet.   She
could not identify the stain near the head of the bed as a foot
track.

Witness's grand children, except Eugene Deats, who was sick,
went to an entertainment at the Presbyterian church on the
night of the tragedy.   Probably the witness's entire household
would have gone but for Eugene's sickness.   Eula did not go,
but was in the house all day of December 24, and all night up to
eleven o'clock.   The night of the tragedy was the witness's third
consecutive night of watching with the sick child.   When the
witness testified on the examining trial, she did not know of the
blood on Eula's pillow, nor did she discover it until between the
fifteenth and twentieth of the following March.   She was too
much distressed, and too much occupied in attending upon her
wounded son prior to his release on bail on March 15, to exam-
ine closely into the condition of all articles in the room at the
time of the killing.   The defendant's pillow was burned when he
was removed from his own into another room.   The witness could
not say whether the small amount of blood on Eula's pillow flowed
from her person or from that of the defendant.   The defendant's
room was carpeted, has not been occupied since the night of
the killing, and, if anything had occurred to obliterate the blood
marks on the carpet, save natural causes, such as fading, evap-
oration, etc., the witness did not know it.   The blood stains on
the carpet extended from a few feet in front of the bed to the
wall.   When the witness made her second visit to the defend-
ant's room, at half past twelve o'clock, and discovered what had
occurred since eleven o'clock, the lamp was still burning, but
had been turned so low that witness did not then distinguish the
blood on the bed.   She went back to her room and got her lamp,
which was burning, and returned.   She then discovered the
blood.   She could not explain why she did not turn up the defend-
ant's lamp at once, except that she was too much frightened and
excited to control her thoughts.   She could not say whether she
removed the axe from the bed when she first went in, or whether
she did it when she returned with her own light.   The witness
was well satisfied that the axe was left that night at the wood
house, and not, originally, in defendant's room.   She had never
before seen it in defendant's room.   After he was wounded, but
not on the night of December 24, the defendant asked witness,

where Eula was. Witness told him that his wife was dead, and he replied : "I'll go to hell."

January, 1886, the month following the tragedy, would have brought with it the third anniversary of the defendant's and Eula's marriage. After their marriage they lived at the witness's house until in January, 1885, they moved to the farm of George McCutcheon, in Williamson county. They returned to witness's house in October of the same year. They did not separate as husband and wife during that year. They, however, wanted to go to house keeping, and were not prepared to do so. The defendant was acting very badly—that is, drinking heavily —and witness suggested to Eula that if she would visit her relatives under the pretense to the defendant that she had left him, he would probably "straighten up" and prepare to keep house. After this suggestion, and the night before Eula left, there was some trouble in the house. The defendant came home late, drinking heavily. He passed through the witness's room into that of his sister Delia, having offended Delia in some way. Delia struck him across the face with a shovel and fled into her room, locking her door. Refusing to open for him, the defendant kicked in one of the panels. Eula and Delia ran into the yard and called for the police. Eula passed the balance of the night in witness's parlor, and next morning started to Manschac on a visit to her relatives. If she went to the house of Fannie Whipple on that day, witness did not know it. This episode occurred six or eight weeks prior to the night of the killing. On the day that she left, a colored woman came to witness's house after Eula's clothes, and witness wrote her to come back; that defendant was not angry with her. She came back to town on the Saturday following, and stopped with her sister, Mrs. Creary. On the following Monday, as witness understood, she went to Elgin to visit relatives, whither, two weeks later, defendant and Mrs. Creary went and brought her and her child home. Mrs. Creary lived about two blocks distant from the witness. Witness knew Eugene Maguire and John Penn.

Question by the State: "Did not you, your husband, Delia, your daughter, Maguire, and John Penn and the defendant have a conference on your gallery, a few nights after Eula was killed, and at that conference was it not agreed that Delia should be taken away from Austin so she could not be used as a witness against the defendant on the charge of killing Eula?"

Answer. "Some men were at my house, but no talk was had nor agreement made about that matter. It was on Saturday night. On that night Delia went to her sister's, Mrs. Creary's. None of the family went with her. The next day, I think it was, she did leave the city, and was gone about three weeks, and returned and was examined as a witness at defendant's examining trial."

Question. "Was it not agreed that night, defendant being present, that Delia should leave to avoid telling what she knew, and was not she offered one thousand dollars to leave?"

Answer. "Not a word of it is true."

Continuing her testimony, the witness stated that, when Eula left home as stated, the defendant was not told where she had gone, not because the family was not ready for them to go to house keeping, but because they hoped her absence would influence him to sober up and mend his habits. Witness never heard of defendant hunting Eula. It was known when Eula came back from Manshac, and defendant went to Mrs. Creary's to see her. He took no arms, unless possibly he had his old pocket knife. Eula did not return with defendant, but came to witness's house on the next day. Defendant begged Eula not to leave him again, and told her that she would not if she had any heart. If defendant and Eula had any trouble with each other after the return from Elgin, witness never heard of it. Defendant quit drinking and got work on the Fireman's Hall.

Cross examined, the witness testified that, during Eula's absence at Elgin, defendant bought a set of bed room furniture, on the instalment plan, from Booth & Son, and had not completed paying for it at the time of the killing. When defendant, replying to witness's statement that his wife was dead, said: "Then I'll go to hell," he added, in reply to some soothing remark of witness: "For I can't live without her." Defendant had not been drinking for four or five weeks prior to the killing. He finished his job on the Fireman's Hall a few days before the killing, took his kit of carpenter's tools home, and the kit was within a few feet of his bed when the killing occurred. The dificulty which culminated in the defendant kicking in Delia's bed room door, as described by witness, was between defendant and Delia, and not between defendant and Eula. George Beauregard and John McCutcheon were among the several parties who knew the room in which defendant and Eula slept. John P. Kirk was city marshal just after the killing.

Requested by the defense to relate in order the occurrences of the night of December 24, 1885, the witness stated in substance, that about five o'clock on the fatal evening, she observed the defendant and Eula in the house, reading and talking, she lying partly in the defendant's lap. After a while defendant proposed to go down town and pay Booth & Son an instalment on the furniture. The witness objected that, it being Christmas eve night, he would meet his friends and take a drink. He promised to return speedily, and witness' wagered him some trifle that he would not get back within fifteen minutes  He left about dark, and returned within fifteen minutes by the clock.  He and Eula then came into witness's room, and the conversation became general, the defendant speaking of his prospects for getting work. Eula sat down on the floor and let her hair down, and proceeded to arrange her front hair in curl papers. She and defendant had perfected their arrangements to take the early train next morning to spend Christmas day and night. Between ten and eleven o'clock, defendant and Eula retired to their room, the latter remarking that she was hungry. Witness told her that she would soon bring her some confectioneries. About eleven o'clock, witness went to the room, and found them as stated on her examination in chief. Witness then returned to her room, but did not undress entirely, as she had to be up and down with her sick grand child. She took off her skirt and some under garments, but kept on her basque, stockings and a light shawl, thrown around her shoulders and breast, laid down and soon dropped into a light sleep. After a time, she was awakened by a voice from the direction of defendant's room. The voice called twice: "Oh, Mama—Eula, darling." Witness made her way to defendant's room, and found the situation as detailed in her examination in chief.  As soon as she reached the room, she took up the crying child, returned to her room, awakened her husband, and then called Mr. Allen, stating that some one had murdered defendant, and that she could not find Eula. She then returned to defendant's room, and could not recollect with particularity what afterwards occurred. Witness's husband and Mr. Allen went for physicians, and Drs. Litten and Fisher soon arrived. Witness, then, being completely prostrated, lay down. A large concourse of citizens soon arrived.

Replying to questions, the witness stated that she heard no noise after leaving defendant's room at eleven o'clock, until she heard the cries: "Oh, Mama—Eula, darling!" When the witness

saw the body of Eula after she was laid out, the front hair was in curls, the papers, save one about one of her ears, having been removed. The clothes worn by Eula on December twenty-fourth were found on the floor, under the foot of the bed, and appeared to have been kicked there by a foot. Her hat was in witness's wardrobe, where it had been all night. Defendant's best clothes were hanging in their usual place behind the door. His every day clothes were on a chair and trunk in his room. His razor was on the bureau in his room, where it generally lay.

Re-examined, the witness stated that defendant persisted in the cries which awakened her, until he was exhausted. Witness did not know at what distance his cries could be heard. The door to witness's room was open. She was unable to say whether the gallery door to defendant's room was open or closed when she went in at half past twelve o'clock. Both of defendant's doors were closed at eleven o'clock, but neither were locked and neither of them had keys. When witness's husband reached the defendant's room, he had on his pants, socks, shoes, etc., and an overcoat thrown over his shoulders. He frequently slept in his pants and socks, but witness could not recall whether he did so that night or not. He got to the room a few moments after witness discovered what had occurred, and had to come about seventy feet. The stains on the floor, which witness thought to be tracks, were discovered by her after several people had come to the house. If the stains referred to were tracks at all, they were tracks of a bare foot person or persons. Witness's husband and Allen were the first persons to reach defendant's room after witness, and Mr. Brown, from the police station, was the next. Witness did not know anything about the finding of Eula's body.

John Abrahamson, for the State, testified that he lived in the neighborhood of the Phillips house, and was abroad on the night of the Eula Phillips murder. While witness, Lundell and Westbrooks were passing the Phillips house on that night, and when nearly opposite, on the south side of the street, which street runs south of the house, witness heard a child crying, and the hoarse voice of man, saying, as he caught the words: "Hush, darling." There was then no light to be seen. Presently a light was struck, and, as it streamed upon the gallery, a woman's voice exclaimed: "Mercy me! Murder!" Witness and his associates ran rapidly to the police station and reported what they had seen and heard, and witness went back with one Brown, walking

rapidly. He did not go about the premises, and only to the door of the room in which a wounded man lay. He did not stay until the body of the woman was found.

Cross examined, the witness stated that the width of the street, eighty feet, and the distance from the north side of the street to the house, making about one hundred feet, was between the witness and the voices. The distance to the police station ran by witness and his companions after hearing the woman's voice cry murder was about two hundred yards. The hour was between twelve and one o'clock. The man's voice, "hush, darling," sounded like a man crying in danger.

Henry Brown testified, for the State, that he was night clerk at the police station on December 24, 1885. Between twelve and one o'clock, on that night, John Abrahamson and two other young men came to the station and reported trouble at the Phillips house. Witness went to the house and found the defendant, quite bloody, lying in bed. Defendant's mother was there. He saw an axe (identifying the one in evidence) standing in the room. Witness took the axe to the station. Witness left Grooms Lee at the station and went after the city marshal. Witness found the marshal and reported to him, and was ordered back to the station. He had a mile to walk, and the body of Eula had not been found when he got back. When witness went into defendant's room, defendant asked him what he wanted. Witness replied that he was an officer. Defendant told witness he had better go away. None of the Phillips family reported the killing to the police station.

Cross examined, the witness stated that, in going from the station to the Phillips house, thence to Hancock's house, and thence back to Phillips's, he occupied from twenty to twenty five minutes. He did not go into the defendant's room when he got back from Hancock's. Abrahamson and the other young men were gone from Phillips's when the witness got back, though witness asked them to stay until he returned. Defendant was then lying on the bed, apparently unconscious. When witness first went to defendant's room he found defendant talking to his mother. He asked defendant who did the bloody work. He made no reply, and witness asked him again and he replied by asking: "Who are you?" Witness replied: "I am an officer." Defendant said: "You better leave." Witness asked him again who did the bloody work, and again he made no answer. De-

fendant was then lying on his back, rather to one side, and was wounded on the left side of his head.

Fannie Whipple, colored, testified, for the State, that Eula Phillips came to her house, in Austin, five or six weeks before she was killed. She came with Delia Campbell, the sister of the defendant, arriving in the morning, and remaining all that day and night, and all of the next day and until two o'clock that night. Witness went to the house of Mrs. Phillips for Eula's clothes. Eula, Delia and a man whom witness did not know left witness's house about two o'clock on the second night. Witness did not then keep an assignation house. Witness was tried before justice Purnell after Eula's death for keeping an assignation house, and was acquitted. No one had promised the witness immunity from criminal prosecution for testifying in this case.

May Tobin testified, for the State, that she lived in Austin, Texas, in December, 1885, and knew Eula Phillips. Eula came to witness's house late in November, 1885, at about twelve o'clock at night. She came with one Mr. Dickerson and remained that night and the next two days and nights, Mr. Dickerson sleeping with her in the same bed on each of the said nights. From the witness's house she went to Manschac. No man other than Dickerson visited Eula at witness's house during the period mentioned. Eula Phillips was at witness's house on the night of December 24—the night she was killed. She came between ten and eleven o'clock and tapped on witness's window. The witness asked who was knocking. She replied: "Eula; don't you know me?" Witness went to the door and saw her for a few moments, but saw no one with her. She got no room at witness's house that night—witness had none. Some hours afterwards—about three o'clock—witness heard of her death.

Cross examined, the witness said that she had seen Eula Phillips previous to the visit to her house covering the three days and nights referred to. Dickerson came with her early in the night. Witness could not say how long she remained on that occasion. She visited witness's house during the day on one occasion in company with a young man who was introduced to witness as Jones, which the witness did not believe to be his right name. She was at witness's house on another occasion during the day with one Shelly, and at another with one Baker. Witness then kept an assignation house, and was testifying now under promise of exemption from prosecution extended to her by city marshal Lucy and district attorney Robertson.

R. B. Eanes. the uncle of Eula Phillips, testified, for the State, that he saw the defendant in November, 1885, before he went to Elgin after his wife. Defendant came to witness's house, asked witness if he had seen Eula, said that he and Eula had separated, flourished an open knife in his hand, and said that he would kill the person who sheltered his wife.

Cross examined, the witness said that it was between three and four o'clock, on the evening after Eula left her home, that defendant came to witness, as stated. He was drinking, and asked witness what he should do. Witness told him to go home and get sober. Witness had not yet heard of the separation.

Albert Highsmith testified, for the State, that, late in October, 1885, on George McCutcheon's place, in Williamson county, he heard the defendant, in the course of a casual conversation, in the presence of Mooney and others, say that, if he knew his wife to be unfaithful to him, he would destroy her, and then destroy himself. Witness had known George McCutcheon for twenty years. He knew of nothing peculiar about McCutcheon's feet, but had never taken any particular notice of them.

Delia Campbell, the sister of the defendant, testified, for the State, that she was living in Austin with her mother in December, 1885. On the morning of the twenty-fourth day of that month witness left home and went to Rosenberg Junction. Defendant and his wife were to go to Manshac to spend Christmas. Eula, the wife of defendant, was unfaithful to her marital vows. Witness saw her in bed with one John Dickerson in November, 1885, but had never seen her in bed with any other man.

Cross examined, the witness said that it was at the house of May Tobin that she saw Eula in bed with Dickerson. That was just before Eula went to Manshac. Dickerson was the man who went with the witness and Eula from Fannie Whipple's house to that of May Tobin. Witness returned from Rosenburg Junction on December 26. She furnished her own expense money on that trip. She soon left again, and was gone two or three weeks. Mr. Kirk furnished witness the money on which she left the last time. Witness did not see Kirk in person, nor did she know him. The object in getting the witness away, as the witness understood it, was to shield the married men of Austin. Witness's parents had nothing to do with the sending away of the witness, and were opposed to it.

Re-examined, the witness stated that but twenty dollars was furnished her by Kirk, and that, two weeks after she left,

Eugene Maguire, mail agent on the Houston and Texas Central railway, who furnished witness the money provided by Kirk, told witness that Kirk sent it to pay witness's board in Houston. The witness did not positively know the object in sending her away from Austin to be that stated, but supposed it to be. Another object, she thought, was to get her away from Austin for the purpose of easy interview.

Re-cross examined, the witness denied that, on the Saturday night previous to her departure for Houston, she had a conference with officers or other persons at which her mother and father were present. She had a talk with Maguire and John Penn at her house, but no one else was present. Witness's parents knew that witness was going to leave, but witness did not think that the defendant did.

Miss Alma Burdett, the sister of Eula Phillips, testified, for the State, that the defendant's jealousy of his wife extended to every man who merely spoke to her. In the summer of 1885, on George McCutcheon's place, in Williamson county, the witness saw the defendant, at the dining table, throw a cup of milk at Eula, with the threat: "I'll kill you." Witness ran from the table into the yard and then back, and with Eula ran again into the yard. The cup was broken to fragments against the safe. McCutcheon called witness and Eula, and they went back.

Cross examined, witness said that defendant and Eula continued to live together after the cup episode. Witness had never seen but the one quarrel between them. Late in November or early in December, 1885, Eula visited the witness at Manshac, and remained with her several days. Witness's feelings towards the defendant were not good. Witness's reason for saying that defendant was jealous of Eula was that every time Eula would mention a man's name he would ask her: "What in the devil do you know about that man?"

Sallie Mack testified, for the State, that she lived near the Phillips house, and, about two o'clock on the night of the killing, she was called by Mr. George Allen to attend and assist the Phillips family. A large crowd was gathered when witness arrived. When Eula's body was brought in, it was washed and dressed by the witness, and then was laid out in the parlor. Witness afterwards got a bowl of water for some one, but for what purpose the witness did not know. On the next morning, the witness saw the bowl, with bloody water in it, in the room then occupied by the defendant. She emptied the bowl, and then

rinsed it, to clean it of adhering dirt. Witness heard no talk between defendant and his mother until the next morning. She supported old Mrs. Phillips into defendant's room on the following morning, and heard defendant ask: "Ma, where is Eula?" Mrs. Phillips said: "She is dead;" and defendant replied: "Then I'll go to hell." Doctor Litten thereupon ordered witness to take Mrs. Phillips away, and witness did so.

Doctor J. M. Litten testified for the State, that, at about one o'clock on the morning of December 25, 1885, he was called to see the defendant. He found the defendant lying in bed, in considerable blood, and badly wounded about the upper portion of the left ear. The wound extended in a curved line, and passed down in front of and below the lobe of the ear. It was deepest at the point above the ear, and was punctured in part, and in part contused. It went to the bone in the upper part. Witness found the periosteum abraded and bruised—roughed by the stroke of some instrument. The witness could not say that the bone was injured. Defendant lay on the front side of the bed in a great accumulation of blood. This blood, though in larger quantity on the front side of the bed, extended to the middle. Eula's dead body was found soon after witness arrived, while he and Doctor Cummings were dressing the defendant's wounds. Witness went to the body, and found it lying prone on the back, the head and shoulders being in rather depressed ground. One arm lay under and the other at right angles to the body, and the legs were distended. The body was nude up to the waist. The forehead had been broken in by the stroke of some instrument, the wound running from the root of the nose upwards across the forehead. The upper portion of the wound was sunken, say an inch and a half, and shallowed gradually to the lower edge. The wound was about an inch and a quarter wide throughout its length, and was such a wound as could be inflicted with an ordinary axe. It was necessarily a fatal wound, and was unquestionably the cause of Eula's death. A small wound, a cut or bruise, was also found on the right ear. One side of her face showed indications of a slight wound. Witness found no bones in the body broken, other than the skull. Deceased was a small woman and would hardly exceed a hundred pounds in weight.

Cross examined, the witness testified that the wound on the defendant's head was such as was calculated to produce a great nervous shock and much physical disability for at least two months. It had such effect upon the defendant, who was under

witness's professional care for that length of time. It produced upon his system, for the period mentioned, nervousness, fever-ishness, sleeplessness, poverty of circulation, and it impaired the action of his heart. The wound near the ear was of a con-tused character and divided the parts down to the bone about a half inch, but was greater when seen by the witness, because of the swelling. The direction of the wound in depth was towards the cavity of the ear. It went directly to the bone, and was evidently stopped by the bone. Finding the surroundings as he did, the witness never thought of the wound on defendant as having been self inflicted. Whether or not it could have been a self inflicted wound had been subsequently discussed. In the opinion of the witness, there was no probability that the defend-ant's wound was self inflicted. The effect of the wound upon Eula must inevitably have been instant death and immediate suspension of all functionary power. The position of the dead woman's body indicated to the witness, when he saw it, that it had been dropped there. Witness saw no indications of drag-ging. The private parts of the woman were neither closed nor widely distended. The vagina contained about a tea spoonful of fluid resembling the male semen, but a little darker in color. Witness did not think that any muscular act of Eula had any-thing to do with the position of her legs. She was powerless to do anything, and the legs must have been placed in the position in which the witness saw them.

Re-examined, the witness stated that he attached no import-ance to the presence of the fluid found in the vagina, and did not examine it microscopically. It was turned over to Doctor Cummings. The passage of the fluid may have been natural, or it may have been retained from previous sexual intercourse on that night. Witness could only speak of the ability of the de-fendant to have inflicted the wound on himself as improbable. He could not say that it was impossible for him to have inflicted it. Witness found a redness, accompanied by considerable sore-ness, on the right side of the defendant's chest, such as could be superinduced by the pressure of a sufficient weight.

George McCutcheon testified, for the State, that the defendant and his wife Eula became tenants on his farm, in Williamson county, Texas, in December, 1884, and left in October or Novem-ber, 1885. On one occasion, during his residence on witness's farm, defendant, in the hearing of the witness, said that if he had an unfaithful wife he would kill both her and himself. On

another occasion, the witness saw defendant throw a tea cup at his wife. Defendant came home from Taylor somewhat in drink, took his seat at the supper table with others, and after some one concocted a drink of cream, sugar and whisky, Eula, speaking to defendant, said: "Jim, you look like a fool; your eyes are that big"—making a circle with her fore finger and thumb. Defendant replied: "Say that again." Eula did so, and defendant hurled a tea cup at her, which was shattered against a safe. Miss Alma Burdett ran into the yard, called Eula, came back into the house, and again ran out, accompanied by Eula. As the defendant rose from his seat to throw the tea cup, he seized a case knife with his left hand and started to follow Eula and Alma. Witness called to him peremptorily to "stop!" Defendant asked witness: "Do you interfere in my family affairs?" Witness answered: "No; but you must stop. You are making a fool of yourself. Go wash your face and lay down." Defendant placed the knife on the table, bathed his face and laid down on the bed. Witness then called Eula and Alma, and they returned to the house.

Defendant drank a great deal after his return to Austin. On, or about December 1, 1885, after he went back to Austin, defendant accompanied witness to the railroad depot. En route, witness asked him how he was getting along, and urged him to quit drinking, as he was making everybody about him miserable and unhappy. He replied that it was not natural for him to act as he had been acting; that formerly he did not mope about with the "blues" and drink, but was cheerful and contented. He then asked witness if he, witness, thought his wife, Eula, was too fast. Witness replied: "That is a pretty question to ask me. No, I think she is a good and virtuous woman, but may be she talks a little too much." Defendant replied that he thought so too, but his mother thought Eula was too fast, and that if he thought she, Eula, was not virtuous he would kill her and then kill himself. The witness was at home on December 24. He went to Austin with Tom Burdett, Eula's father, on December 25, reaching Austin in the afternoon. He went direct to defendant's room. Defendant said: "George, Eula is gone and I am d—d near killed, and ought to be dead."

Cross examined, the witness detailed the conversation with defendant en route to the depot in Austin, on or about December 1, 1885, substantially as he did on his examination in chief. The statement previously made by the defendant, to the effect that

if he had an unfaithful wife he would kill both her and himself, was made in casual conversation. Witness could remember no one present at the time but Albert Highsmith. Defendant's wife was not then the subject of conversation. Defendant was drinking at the time of the conversation in Austin.

Question. "Is it not true that you were in the habit of having carnal intercourse with Eula Phillips while she lived at your house, in Williamson county? You need not answer the question unless you please to do so."

Answer. "I decline to answer the question."

Question. "Were you not in the habit, after she moved to Austin, of coming to Austin and seeking her for that purpose—carnal intercourse?"

Answer. "I did not; not once."

Question. "When were you openly in Austin last before December 25?"

Answer. "I don't know; I can't tell; but I am satisfied it was after the conversation on the street. I was not in Austin on the night of December 24, 1885."

Continuing his testimony, the witness said that he was at the place of Captain Fred Mitchell, in Williamson county, on the fatal night. Those present were Captain Fred and Tom Mitchell, witness and his brother Jack, one of the Frame boys and others. Witness got to Mitchell's about nine o'clock. The party left about twelve, all pretty drunk. Witness went home, and heard of the killing on the next day. He was sent for to go to Austin with Tom Burdett, Eula's father. Witness knew Delia Campbell, who once visited Eula Phillips at witness's place. Witness was sick during a part of Delia's visit. Witness had never talked to Delia Campbell about his relations to Eula, or about a criminal intimacy between himself and Eula, either in Williamson county or elsewhere. Witness never, at any time or place, either at home, in Austin, or elsewhere, told Delia Campbell that if Eula threw him off or discontinued her criminal relations with him, he would kill her. Witness never, at any time, at his home in Williamson county, in the presence of Delia Campbell and Albert Highsmith, or any body else, made an attempt upon the life of the defendant with a knife or any other weapon. Witness did not attend the funeral of Eula Phillips, but, at the instance of Mr. Ledbetter, he remained at the Phillips house where the defendant was, for the purpose of seeing or hearing anything that would throw light upon this tragedy.

Question. "Is it not true that, at about night after Eula's funeral, you was in the parlor at the Phillips house, and did not a child come in and tell old Mrs. Phillips that two officers were at the door; and did you not get up at once and ask to be concealed, saying that the officers were after you? Did not something of this substance occur?"

Answer. "Nothing of the sort occurred."

Question. "After Eula's death, did you not meet Delia Campbell at Mrs. Creary's, and, during a talk with her, did you not say to her that, if she ever told on you, and what she knew about you and Eula that you would kill her; and did not Delia say that if called upon, she would tell the truth; and did you not then start towards her angrily, and did not she, Delia, then step towards a bureau, in which she had a pistol; and did you not then say to her: 'Would you shoot me?' and did she not reply: 'I will if you lay your hand on me;' and did you not then resume your seat?"

Answer. "I remember meeting Delia at Mrs Creary's, but nothing of which you ask took place."

Question. "Did you not, at another time, on the train, meet Delia Campbell, and again threaten her—threaten to kill if she told what she knew about you and Eula?"

Answer. "I remember meeting her on the train, but I did not threaten her."

Question. "Did you not, on two occasions, at Doctor Tobin's drug store, buy chamomile flowers, extract of cottonwood and ergot for Eula, to aid her in producing an abortion upon herself, and did you not deliver the said drugs to Eula, in the presence of Delia Campbell, after tearing the labels off the phials?"

Answer. "I bought drugs at the instance of Delia Campbell, and gave them to her, but did not remove the labels."

Continuing, the witness testified that he was unable to say how often he visited Austin after Eula's return from Williamson county, before Christmas, but probably five or six times. He came each of those times to collect fifteen dollars due him by the defendant. Witness gave Eula ten dollars to bear her expenses when she went to Elgin. There was nothing peculiar about the little toe on witness's right foot.

Re-examined, the witness testified that Jack McCutcheon, Bob Mitchell and another man were in attendance upon this trial, who were at Captain Mitchell's with him, witness, on the night of December 24, 1885. Witness reached home from Mitchell's at about twelve o'clock. Witness had never threatened to kill Eula;

he did not kill her; he did not know that she was going to be killed, though he had feared for some time that the defendant would ultimately kill her.    Mr. Creary and witness's brother, Beauregard, were present when witness gave Eula the money to defray her expenses to Elgin.    Eula and Mrs. Creary went together that evening to the Phillips house to get Eula's trunk. There was no concealment about Eula going to Elgin, but she appeared to be afraid to go after her trunk.    Eula got her trunk, returned to Mrs. Creary's, and said that defendant met her kindly and put his arms about her neck.    Witness saw Eula about a week before her death.    She and Delia Campbell invited witness to spend Christmas day with them in Austin.    Witness had been a widower about a year.

Re-cross examined, witness said that he waked up Tom Burdett, Eula's father, on his return from Mitchell's.    He was drinking was the reason.    Burdett slept in a room across a hall from witness's room.    The witness said nothing to defendant about giving Eula money to go to Elgin.    Some one, witness could not say who, but probably Mrs. Phillips or Mrs. Creary, was in defendant's room after he was wounded, when witness was there.    Defendant appeared rational when he spoke to witness on that occasion.    Had witness killed Eula Phillips he would now confess it on oath.

Mrs. S. M. Dyer testified, for the State, that her residence and the Phillips house were on the same block.    The witness was called by old man Phillips between twelve and one o'clock on the night of December 24, 1885.    She dressed and went to his house.    Mrs. Phillips, Mr. Phillips and George Allen, when witness saw them, were dressed in their usual every day clothes. Witness did not see Eula's body until it was brought in.    The single garment on the body was drawn taut under the arms and twisted into a rope.    The skin was off the back in places, and indicated that the body had been dragged.    Blood, sand and dirt mingled with Eula's hair.    About six weeks before the tragedy, witness heard quarreling over at the Phillips house.    She heard a man's voice, not that of old man Phillips, say "God d—n you, I'll kill you."    A woman's voice then called for the police.    This occurred on the night of the difficulty between defendant and Mrs. Campbell.

Cross examined, the witness testified that when she went to sleep shortly before twelve o'clock on the fatal night, every thing was quiet about the Phillips house.    When Eula's body was first

brought in, the witness observed that the front hair was done up in yellow curl papers.

Justice of the peace Von Rosenberg testified that he arrived at the Phillips house after a number of people had congregated, but before Eula's body was found. Witness saw blood, in splotches, on the gallery from the door down to and off the steps. He trailed that blood with dogs to the body.

Cross examined, the witness identified certain pieces of plank in evidence as the ones he caused to be cut from the floor along the bloody line. Witness examined the fence between the yard and the alley at a point near where the body lay. On the side of a plank near the top of the fence the witness saw a blood spot, between three-fourths and an inch wide, and one and a half or two inches long. A piece of scantling, two by four inches, lay across the breast of the body. Witness thought he was the first to find the body. It lay from one hundred and fifteen to one hundred and forty feet distant from the defendant's room. The night was a bright moonlight night. The blood spot on the fence was not a splotch, but such a spot as would be made by the ball of the thumb or a finger. Witness saw no blood on the fence post.

Blood hounds were procured and put on tracks in an adjoining yard, pointed out by George Allen. The dogs led thence into the Phillips yard, across it into the alley, thence down the alley westward, down the street by the colored church, through a ravine that ran from a branch, thence to the bridge on the bank, thence back, thence to the house on the Burlage place, thence across Shoal creek, thence to the hills near the old military academy, in a northwest direction, in the neighborhood of General Shelley's place, and thence into the post oaks. The young dog was now led in leash, and the witness and his party followed the old dog through Clarksville. when the old dog was placed in leash. The party followed the dogs to Clarksville, one and a half miles from town, and went on to Cook's place, a mile farther. Witness's experience with dogs did not qualify him to say that the dogs were or were not trailing on that trip. A spot was shown to the witness, in the alley, as a blood spot, and the dogs were taken to it. Witness could not say that it was or was not a blood spot. He could not say that the impression near it was the track of a human foot. The impression was about midway of the alley, directly opposite the point where the body lay, and the blood spot on the fence. The body lay on the

back, face up and legs apart, the knees crooked or a little raised. There was but one garment on the body, and it was unevenly drawn up about the upper part, partially covering the bust. Witness did not know whether there was blood on the garment. or not. The head rested in considerable blood.

Re-examined, the witness said that the pursuit with the dogs occurred on the evening of December 25. He could not say how many people had been in the alley up to that time. Witness observed some scratches on Eula's body, from which he inferred that the body had been dragged over the ground.

G. R. Thompson testified, for the State, that he was a sergeant in charge of a squad of convict blood hounds. Witness, with two of his dogs, one of them being the best he had in his squad, reached the Phillips house about four o'clock p. m., on December 25, 1885. The dogs were started at about the place where the dead body of the woman was said to have been found. Thence the dogs went towards the Phillips house, creating considerable excitement among the on lookers. Witness stopped the dogs and circled them around the spot where the body was found, to see if they could strike a trail. They were then put on a track in an adjoining yard. They led to the alley fence, were lifted over, and went thence down the alley into a street and out into the country. Justice Von Rosenberg was with the party. The dogs were followed until the old dog appeared to want to go through a wire fence, some two miles from town. Witness then leashed the dogs and led them on about a mile further. Witness could see no evidence that the dogs were following tracks. Returning to town, witness asked permission to take the dogs into Phillips's yard at night, after the crowd had left. This being granted, witness turned his dogs loose that night at the spot where the body was found. The old dog followed the trail of blood back to the house from that place, and into the room occupied by the defendant, reared up on the defendant and smelled of him. Defendant called "mother," and the dog drew down and went into an adjoining dark room, found a bundle of bloody female garments, including a pillow. Smelling of the bundle, the dog passed into the room in which the dead body was lying. Driven thence by the watchers, he hunted around until he found a basin of bloody water, of which he smelled.

Cross examined, the witness said that his old dog was a cold trailer, but witness could not say how cold a trail he could follow. From the fact that it was the habit of that dog to howl on

striking a trail, and that he did not howl on that pursuit, the witness inferred that he failed to strike a trail. Witness could say that that dog could strike a trail six or eight hours old and follow it. It would depend upon climatic conditions, dew, moisture, brush and grass, whether he could take a colder trail.

E. J. Ledbetter testified, for the State, that he was at the Phillips house on Saturday night, December 26, 1885. Between two and four o'clock, on Sunday morning, the defendant's mother brought a basin of water into the defendant's room, removed his red socks and washed his feet. The witness was lying on the sofa behind Dean, and did not see the bowl of water after that operation. Mrs. Phillips asked for no help, and took the basin of water out of the room when she got through. Dean was then lying on the floor, asleep. Mrs. Phillips did not appear to be acting secretly.

R. B. Mitchell testified, for the State, that he was now present at the instance of George McCutcheon's brother Jack. Witness saw George McCutcheon at Captain Mitchell's ranch, in Williamson county, on the night of December 24, 1885. George McCutcheon left Mitchell's about midnight, to go home. Witness saw him next day, at Hutto, waiting for a train, to go to Austin with Eula's father.

A. D. Wooldridge testified, for the State, that he, George McCutcheon and others, attended a stag dance at Captain Fred Mitchell's ranch, in Williamson county, about twenty-four miles from Austin, the night of December 24, 1885. About ten old stags were in attendance. He saw George McCutcheon there as late as twelve o'clock.

Jack McCutcheon testified, for the State, that he went to Captain Mitchell's ranch, in Williamson county, with his brother, George McCutcheon, about nine o'clock, on the night of December 24, 1885, and left there with him about twelve. Witness got Wooldridge and R. B. Mitchell to attend this trial, to prove the whereabouts of his brother on that night, because he had been informed that an effort would be made to implicate him in this trouble.

Tom Burdett, Eula's father, testified, for the State, that he saw George McCutcheon on his place in Williamson county, Texas, about twenty-four miles from Austin, between twelve and one o'clock on the night of December 24, 1885, and came with him to Austin on the next day, arriving on the evening train. Witness

agreed to pay George McCutcheon ten dollars advanced by him to Eula.

Mrs. Phillips, the mother of the defendant, was recalled by the State, and testified that she had but an imperfect idea of the lapse of time after she discovered the murder, but thought that not more than fifteen or twenty minutes elapsed from the time she discovered the murder until she discovered the stains she took to be bloody foot tracks by the bedside. Witness got blood on the heels and balls of her feet while in the defendant's room. Witness's toes do not touch or reach the ground. Witness did not wash the defendant's feet until Sunday morning, at which time there was no blood on them. Witness did not recollect that Sallie Mack brought her a basin of water, but she may have done so. Witness was much exhausted on the night of the killing, and left the care of things largely to others, and, consequently, knew nothing of many things that took place.

The State closed.

The defense first called Justice Von Rosenberg, who identified two pieces of plank as those taken from the floor of the Phillips house. Upon each is the bloody track of a foot, one being the right and the other the left foot.

George Allen testified for the defense, that he lived on the Phillips place in December, 1885. He reached home about ten o'clock on the night of December 24, and, passing the room of the defendant, he heard the defendant and Eula talking to and playing with their baby. Witness retired at about eleven o'clock, and got to sleep within fifteen minutes. Witness heard no quarreling or other angry noise at the Phillips house after he got home. A light was burning in the defendant's room when witness passed it at ten o'clock. At about half past twelve o'clock old lady Phillips came to witness's door and said: "Bud is knocked in the head and Eula is gone." Witness and his wife got up instantly. Witness dressed as quickly as he could, and left his room by the door which opened on a hallway. Instantly witness observed blood on the hall floor. Witness went direct to the defendant's room and found the defendant lying in bed and throwing his arms about his head. The child was crying. Witness said nothing to the defendant, but passed through the room and called to his wife for his hat, to go for a doctor. Witness, taking the middle of the street, went for Doctor Litten. As he passed the police station he hallooed to three men standing in the stairway, informing them of what had

happened, and asking them to notify the officers. Leaving Doctor Litten's after calling him, witness met Von Rosenberg in a carriage, and preceded him to the Phillips house. Witness took Von Rosenberg to the hall way and exhibited the blood to him, and at that time heard of the Hancock murder, perpetrated in another part of town but a short time before. Von Rosenberg followed the bloody trail to Eula's body. On the next day witness found blood on the fence and on a fence post near the point where the body was found. The blood on the fence was on the top plank and had apparently been put there by the ball of the hand. The blood on the post was in spots which seemed to have been dropped. Witness also saw blood on the lower plank of the fence, which was put there by contact with some bloody substance. Witness saw, in the second yard from Phillips' place, several bare foot tracks, made evidently by some person leaping from the fence. Those tracks, three in number, pointed diagonally toward the alley fence, and were distinctly marked by the toes. Witness pointed them out to Von Rosenberg. In the alley, at a point about one hundred feet from where the body was found, there was an impression in the ground, and near it there was a spot of blood, quite as large, or larger, than a quarter dollar piece. That clot of blood looked like it came from the foot that made the impression on the ground near it. Some feathers adhered to that clot of blood, and witness observed chicken feathers in the alley near the point where the body was found, and where the blood was found on the fence and post. The witness also saw some blood on a privy or out house abutting on the alley, a short distance from the impression and clot of blood last described. The blood on the out house was small in quantity, and was in specks, and had evidently been thrown against the house. Witness did not think that more than two minutes elapsed from the time he was called until he reached defendant's room. Witness, as a fireman, was an expert in getting into his clothes, and dressed in a hurry. Witness went into defendant's room through the back door, which he pushed open, the same being closed. Witness was the brother-in-law of the defendant.

Cross examined, witness said that he did not think he stated on the examining trial that the back door of the defendant's room was open when he reached it. Witness saw blood on the gallery as soon as he opened the door. He also saw some blood on the ground. The defendant was in bed, lying on the front

side, when witness reached his room. His baby was sitting up in bed, crying. There was enough light in the room, from the lamp burning, to see well. The witness looked around the room, paid no especial attention to defendant, and did not speak to him, but went on through and after Doctor Litten. The cover was drawn up around the defendant's waist. Witness saw blood on the front part of the bed, but noticed none on the back part. Witness could not say whether or not the defendant had on his pants.

Question. "Did you not find him with his pants on, and did you not say to him: 'Jim, why Jim, havn't you been to bed?' And didn't he answer: 'No, by G—d, I am not going to?'"

Answer. "No; not one word of it. I was clerking for F. E. Jones in January last."

Question. "Did you not, at Jones's store in Austin, in last January, say to John P. Kirk that, when you went into defendant's room on the night of the tragedy, he was lying on the bed with his pants on, and that you said to him, defendant: 'Have you not gone to bed yet?' and he replied: 'No, nor do I think I can?'"

Answer. "No, I said no such thing, and Kirk knows I did not."

Continuing, witness testified that, in passing through the defendant's room, he saw no one but the defendant and his child. He did not see either of defendant's parents at that time. He went directly after the doctor, and to notify the officers. He detailed his subsequent movements, discovery of blood, etc., substantially as in his testimony in chief. H. M. White and others saw the blood described by witness. Witness saw Eula's body where it was found, and soon after it was found. Three pieces of scantling lay across the body; two across the breast and one across the abdomen.

Albert Burleson testified, for the defense, that he was at the Phillips house early on Christmas morning. Near the spot where the body was said to have been found the witness saw, on the top plank of the alley fence, the prints of four bloody fingers. Those prints were on the outside or alley side of the fence, and appeared to have been made by a person with a bloody hand clasping it in getting over the fence. Witness looked for but found no tracks in the alley.

Doctor Cummings testified, for the defense, that he was called professionally to the Phillips house about one o'clock on Christ-

mas morning, 1885.  He found the defendant in an unconscious condition, wounded about in the manner described by Doctor Litten.  Two or more blows were required to make the wound. Defendant then and yet suffered greatly.  Witness attended him two weeks until he was taken to jail, and again after his release, in connection with Doctor Litten, for about two months.  In the opinion of the witness the wound on the defendant was such a one as he could hardly have inflicted upon himself.  Witness saw the dead body of Eula.  It was nude from the bust down. The legs were apart and the privates were distended.  Witness removed a white opaque fluid from the vagina, which resembled the male semen, and at the time thought it likely the woman had been outraged after death.  He saw no blood on the legs. The wound on her forehead was the cause of her death.  The slight wound on one ear was inconsequential.

Cross examined, witness said that he subjected the fluid taken from Eula to a microscopic examination, but found it to contain no vital or life imparting germs, such as usually inhabit the male semen.  Such germs, however, are not always present in the male semen.  As a rule the male semen always contains the germ, but certain conditions of the body destroy them, sometimes before and sometimes after deposit.  The fluid was thinner, and of a shade lighter color than the male semen usually is. Witness thought it almost impossible and entirely improbable that defendant could have inflicted the wound upon himself. Upon the whole, he thought it impossible.

Deputy United States Marshal H. M. White testified, for the defense, that he was at the Phillips house soon after the tragedy on Christmas night, and again on the next day.  Witness found tracks in the defendant's room, on the gallery of the Phillips house, and on the Allen gallery, and blood marks on the fence dividing the yard from the alley.  Witness measured two or three of the tracks with paper, and afterwards applied a measure rule to the paper.  All of them corresponded in size.  The width across the ball of the several tracks, all being the same, was from four to four and a quarter inches, the length in each case being ten and a half inches.  Witness saw the track in the alley, and the blood clot near it, described by Allen, and referred to by Von Rosenberg, and walled them about with sticks to prevent obliteration by curious searchers.  That track showed a blood spot as though impressed by a small quantity of blood adhering to the middle of the foot, and a clot of blood rested on

the side as though cut from the foot by the sand or gravel. Witness measured this track as well as he could, and found the width to correspond with the other measurements, but, the impression of the heel and toes being indistinct, it was impossible for witness to get the length accurately. Some small feathers were adhering to the blood spot near this track. Witness saw the blood spots on the fence, and the splotches on the outhouse described by Allen. The blood mark on the top plank of the fence the witness described very much as did Albert Burleson. The blood splotches on the fence post at the same point looked to witness like they had dripped from the foot of a person scaling the fence.

Cross examined, the witness testified that the blood mark on the top of the fence showed the impression of the palm of the hand on the yard side, and of the ends of the fingers on the alley side. Witness made the examination described in the day time. He did not know how many people had then been in the alley. Several persons were present when witness measured the track in the alley. Witness told Allen about that track, and he and Mrs. Creary and other persons saw it. That track was some twenty feet up the alley from the point opposite where the body was found. The ground at the point where the track was was composed apparently of earth and ashes mixed, and was much softer than the ground opposite the point where the body lay. Witness saw no tracks between the point opposite the point where the body was found and the track described. Witness had heard several persons speak of having seen that track. Witness worked alone. Considerable rivalry arose between the different policemen and detectives working on the case. Witness saw a bloody track in the Phillips yard near where the body was found. He could not say that any body else saw it. Witness was not in the employ of the Phillips family to work the case for the defense. Witness lived on the Phillips premises at the house of Mrs. Dyer, who was his sister.

Doctor C. E. Fisher was the next witness for the defense. He described the wound on the defendant substantially as did Doctors Litten and Cummings, but particularized that, in his opinion, the blow that caused the wound was struck by some one from behind the defendant. The blow, to have made that wound, must have been struck with great force. After a careful study of the wound the witness became satisfied that it was next

to impossible for the defendant to have inflicted that wound upon himself.

Cross examined, the witness stated that he could not swear that it was impossible for defendant to have inflicted the wound himself, but he did not believe it possible, and it was entirely improbable. The wound was a very severe one, and was on one of the hardest bones in the human system. It was severely injured, and, the witness believed, from the fact that his probe entered it, that it was partially fractured. Witness made a personal examination of the wound. Dr. Bragg was present on one occasion when the witness examined the wound.

F. E. Jones testified, for the defense, that he was at the Phillips house on Christmas morning. He saw some blood on the fence, which was put there, he thought, by the pressure of a human hand. He saw some blood on an out house which seemed to have been thrown off from something. He also saw a clot of blood on the ground, about midway in the alley, near what was said to be a foot track.

Cross examined, witness said that the last described clot of blood was within five inches of the impression on the ground which was said to be a foot track. That impression was plain. There were quite a number of other tracks in the alley. Many people were passing up and down the alley, and several persons looked at the blood and the tracks, but witness could remember none of them. Witness did not know how that track came there, nor who made it. Witness observed no indications of a person having scaled the fence at the point where he saw the blood. None of the tracks in the alley seen by the witness were bloody.

Walter Booth testified, for the defense that, on the evening of December 24, 1885, between half past five and six o'clock, the defendant came to the store house of Booth & Son, and paid the money due on an installment for a set of furniture he had bought some time before. Defendant was then sober.

Cross examined, the witness said that Booth & Son's store was on Pecan street, three blocks east of Congress avenue. From Booth & Son's store to the Phillips house was eight and a half blocks. Austin city blocks were two hundred and seventy-six feet long.

Mr. Miller testified, for the defense, that he lived near the Phillips house, and some sixty or seventy feet from where Eula's body was found. Witness got home a little after ten o'clock on the night of the murder. Witness's wife went to bed some little

time after witness got home, and witness soon retired. Before getting to sleep witness heard cows in his yard. He got up and drove them out, and again retired, but before he got to sleep he was called by old man Phillips, who told him of the tragedy, and asked him to go to the house. Witness heard no noise or confusion at the Phillips house on that night. Witness did not go to the Phillips house, because his wife became greatly excited and frightened. Witness did not consult his watch, but thought it was about twelve o'clock when he got up to drive the cows out of his yard.

Charles Raymond testified, for the defence, that he nursed the defendant in his room on Christmas day, leaving there about half past five o'clock in the evening. He returned again at eight, and sat up until after twelve o'clock that night. George McCutcheon, whom the witness knew, did not come to defendant's room while the witness was nursing him, and during all of the time while witness nursed he was in defendant's room. On Christmas morning witness saw blood on the top plank of the alley fence, and on the out house, and a clot with feathers adhering in the alley near a foot track.

Cross examined, the witness said that the blood on the out house appeared to have been splashed on it, the largest speck being about the size of a pin head. Of the blood found in the alley, that near the foot track was nearer Phillips's house than was that on the out house. Eula Phillips was buried about four o'clock on the evening of December 26, 1886. Witness did not know what occurred at the Phillips house while he was at Eula's funeral. The witness was not in defendant's room on the twenty-sixth. He sat with defendant on alternate days. Witness did not see or hear Ledbetter invite George McCutcheon into defendant's room on Christmas evening. Several parties went into defendant's room, some of them strangers to witness. Witness did not then know McCutcheon. It was the impression of the witness that the south bound International and Great Northern railroad reached Austin in the evening after five o'clock in December, 1885. Witness knew Tom Burdett by sight, but did not see him at defendant's room before leaving on Christmas evening. Ledbetter stood at defendant's door on Christmas, admitting some and excluding other people. Witness saw Tom Burdett at the Phillips house after night. Had a stranger gone into defendant's room and talked to him while

witness was nursing, witness would have observed it.   George McCutcheon did not do so.

Ham Riley testified, for the defense, that he nursed the defendant on the Wednesday and Thursday following Christmas day. Defendant lay unconscious while in charge of the witness, but had occasional lucid moments.   In one of these he remarked, having recognized witness: "Them fellows hit me a h—ll of a lick."   Witness asked him who, but he relapsed into unconsciousness and talked foolishly.   Defendant's intervals of reason were very brief.

Cross examined, the witness said that he could not get defendant to tell him who he meant by "them fellows."   In his lucid moments, as a general thing, defendant would ask for water or medicine, or call the name of some one or more of his friends. Witness never succeeded in getting him into a connected convertion.

Monroe Miller testified, for the defense, that he was the undertaker who had charge of the body of Eula Phillips and prepared it for burial.   The wound ran from the center of the forehead to the left and a little downward, inclining to the left temple.   It did not range up and down the forehead.   Witness placed cotton in the indentation and secured the lips of the wound with court plaster.   The wound was deepest in the center, and shallowed as it ran downward towards the left temple.

At this stage of the proceedings the defendant, in the presence of the jury, bared his feet, and, after stepping in a platter of ink, stepped on a deal board, making two tracks.   He again inked his feet, stepped on the board, and took his counsel, Major W. M. Walton, in his arms, making two tracks.   Then, at the suggestion of a juror, he placed his right foot into the ink, took Major Walton in his arms, and stepped on the board on the ball and toes of his right foot, and so bearing all of Major Walton's weight, one hundred and seventy-five pounds, made a track. Thomas H. Wheeless was then introduced by the defense and testified that he had made accurate measurments of the tracks on the pieces of flooring identified by Von Rosenburg, and of those made in the ink on the deal board.   He testified, with respect to the tracks, as follows:   "The defendant's track made with ink on the ironing board, with Major Walton in his arms, measures across the ball of the foot three and three-eighths inches.   Another like test measures three and seven-sixteenths inches.   The defendant's track, made with his own but without

other weight, is three and three-eighths inches across the ball of the foot. Another like test three and three-eighths inches across the ball of the foot. Defendant's toe and ball of foot track made with Major Walton in his arms, measures across the ball of the foot three and five eighths inches. The panel with bloody imprint upon it is placed before me. The track across the ball of the foot measures four and one-eighth inches. From the end of the big toe to the hollow of the foot measures five and a quarter inches. The ink track made by defendant with Major Walton in his arms measures four and three-eighths inches from the end of the toe to the hollow of the foot."

Cross examined: "The tracks here made by the defendant in ink have enlarged since they were made—spread—but they evaporate quite quickly; much quicker than blood will dry. The blood track would enlarge more than the ink.

Mr. Campbell testified, for the defense, that on Christmas morning he saw the place where Eula's body was said to have been found. Witness saw blood on the fence, foot prints on the outside and drops of blood on the fence post, on the inside of the fence, at the place where he saw the spot. Witness saw a foot track and a blood spot with feathers adhering to it further up the alley, and still further up he saw blood on an out house.

Cross examined, the witness said that he took the feathers to be chicken feathers. The clot of blood in the alley appeared to have dropped from the shoe. Witness could not tell whether the track near it was made by a boot or shoe. It was a track, and near it was the clot of blood and feathers. The witness searched for other tracks in the alley, but gave up the search as useless, because of the great number of people who had been in and out of the alley. This particular track was pointed out to witness by George Allen, and had sticks penned about it. There was but little blood on the top of the fence, but enough to impress the witness with the belief that whoever put it there did so getting over the fence.

Question. "Did you see a bloody track on the inside of the yard?"

Answer. "I can't recall whether I did or not. I did not see any in the alley, save those spoken of, that attracted my attention particularly."

By a juror: "Did you notice bloody tracks along the line of blood from the house to the body, or where the body was said to have laid?"

Answer. "Yes, but I could not indentify them. They were simply blood impressions made by the foot, but not defined' tracks. The route of blood and of the dragging of the body, part of the way, were clearly defined, and tracks, or what I took to be tracks, of blood accompanied it. It was seven or eight o'clock when I was there. I saw no bare foot tracks that could be identified as such in the yard. There were bloody impressions that I took to be tracks."

Re-examined, the witness testified that, after seeing feathers in the clot of blood near the foot track in the alley, he returned to the point on the fence where the blood mark was, to see if he could' find feathers about there, and if the feathers in the clot of blood were carried from that point. Witness saw similar feathers at the place on the fence where the blood spot was. "I saw the impression of a foot track in the alley by the clot of .blood, but I do not undertake to say that the track was made by a boot, shoe or bare foot, although counsel for the State have tried hard to make me say it was a boot or shoe track. I don't know what it was made with. The ball of the foot was plainest. I can't swear it was a foot print at all. I thought it was then and think so yet, but it was not distinct enough for me to swear it was a foot track."

Delia Campbell, testified, for the defense, that she was at George McCutcheon's house, off and on, for about twelve weeks. She never heard George McCutcheon threaten Eula or utter threats against her. He tried once, while witness was on a visit to his house, to kill the defendant with a rock and a knife, but was held and restrained by the witness and Eula. He had been drinking and had one of his "spells." He had lost some money and said that he thought defendant had it. The relations between George McCutcheon and Eula appeared to be and were intimate, and George McCutcheon himself told the witness as much, at the Phillips house, several weeks before the tragedy. George McCutcheon bought extract of cottonwood, chamomile flowers, ergot and another medicine at Doctor Tobin's drug store, in Austin, for the purpose of producing an abortion on Eula. He tore the labels from the bottles and gave them to Eula in the witness's presence.

George McCutcheon, on two different occasions, threatened to kill the witness if she told what she knew about his relations with Eula. At Mrs. Creary's house, on the day that defendant was admitted to bail, George McCutcheon asked the witness

what she had testified on the habeas corpus proceeding. Witness replied that she did not know. McCutcheon then said: "If you give me away I will kill you." Witness laughed in a manner to anger him, and he strode towards her. Witness stepped towards a bureau in which she had a pistol, when McCutcheon stepped up and asked: "Would you shoot me?" Witness replied: "Yes, if you put your hands on me." McCutcheon then turned the matter off. At another time, meeting on the train, he threatened to kill witness if she "gave him away" about his relations with Eula. On the evening of Eula's funeral George McCutcheon was among those present in Mrs. Phillips's parlor. A little child came to Mrs. Phillips and said: "Two officers at the door want to see you." McCutcheon sprung from his seat excitedly and said: "They are after me about the murder!" Beauregard McCutcheon, George's brother, was present, and witness told him to take his brother off as he was going to have one of his "spells." When in his "spells" George generally becomes unconscious, and appears to suffer. The defense closed.

Doctor Bragg testified, for the State, in rebuttal, that he went to the Phillips house with Doctor Fisher between three and four o'clock on Christmas evening. Defendant replied rationally to the witness's questions. The witness examined the defendant's wound, and thought it both possible and probable that defendant could have inflicted that wound upon himself. The witness directed attention to the fact that a part of the front cuticle of the ear was knocked off as by a glancing blow. The most serious wound was above the ear, and in the rear of the front angle. It went inward and downward, and was deepest at the top, shallowing as it went down. The edges of the wound were irregular, lacerated. The witness could see no reason why a person could not inflict such a wound upon himself.

Cross examined, the witness said that he did not probe the wound, but used a syringe in washing it out. He found no fracture of the bone. Doctor Fisher did not tell witness that he saw or found a fracture of the bone. The fluid injected into the wound did not pass out through the orifice of the ear.

Re-examined, the witness said that he made a reasonably careful examination of the wound, and he did not find, nor did he believe there was, a fracture of the bone. He did not examine the wound as carefully as he would have examined it had it been his case. Doctors Litten and Cummings were the sur-

geons in charge. Doctor Fisher had been attending others of the Phillips family and asked witness to go with him and look at the wound, as it was probably his case.

R. A. Boyce testified, for the State, that he saw the body before it was moved, and threw a blanket over it to cover its nudity. Three pieces of scantling rested across the body, two across the breast and one across the pit of the stomach.

The motion for new trial raised the questions discussed in the opinion.

*Walton, Hill & Walton, John Hancock,* and *J. R. Hamilton,* filed an able brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. I. Over objections of defendant the prosecution was permitted to prove by several witnesses facts which showed that deceased was not virtuous; that she was unfaithful to the defendant, her husband; the evident purpose of introducing such evidence being to show that defendant had a *motive* to commit the murder. Defendant's counsel presented the following objections to this evidence: "1. That it was inadmissible in any view of the case, being matter foreign to the issues before the jury, and could not throw light, directly or indirectly, on the guilt or the innocence of the defendant. 2. That said testimony was wholly inadmissible in any event, unless knowledge of the irregularities and infidelity of the wife was brought home to defendant. 3. That the matter sought to be drawn out was foreign matter, and in its nature calculated to prejudice, if not positively injurious to, the rights of defendant. 4. That the said matter injected new issues into the case, in addition to the one of the guilt or the innocence of the defendant, and was calculated to draw the minds of the jury off from the issues in the case. 5. That no predicate had been laid for the admission of said testimony, by showing that the acts of the wife, or any of her acts of irregularity or infidelity, had been communicated directly or indirectly, circumstantially or otherwise, to defendant. 6. That the testimony on this line, if admitted, would drag into the case foreign matter of a scandalous and sensational character, that would confuse the jury, draw their minds from the true issues in the case, and seriously prejudice defendant in his legal rights, and prevent him from having a

fair and impartial trial, on evidence pertinent to the charge brought against him."

When these objections were made, the court stated that the evidence was inadmissible, unless the State should be able to prove satisfactorily that defendant was advised of the infidelity of his wife. Thereupon counsel for the State assured the court that they expected in the course of trial to produce evidence which would prove that defendant was informed of and did know of his wife's infidelity at the time of her murder. Upon this assurance the objections to the evidence were overruled, and the evidence was admitted.

It can not be controverted that this evidence is of a material nature, when we consider that the evidence relied upon to establish guilt is wholly circumstantial. That defendant had a motive to commit the murder would be, in view of the other evidence, a strong circumstance againt him, and without proof of motive the other inculpatory circumstances would be very much weakened. For the single purpose of showing motive the evidence objected to was admissible, if it was accompanied with proof satisfactorily showing that defendant at the time of the murder had knowledge of the improper conduct of his wife. It was not admissible for any other purpose, and not even for this purpose unless a knowledge of the facts by the defendant before the murder was shown to exist. Unless such knowledge was shown, such evidence was wholly foreign to the issue, was manifestly irrelevant, and should have been excluded. The learned trial judge entertained this view of it, and would not have admitted it except upon the assurance of counsel for the State that proof of defendant's knowledge of the infidelity of his wife would be shown by testimony thereafter to be adduced during the progress of the trial.

In Marshall v. The State, 5 Texas Court of Appeals, 273, it is said that the relevancy of testimony need not be apparent at the time it is offered, it being the usual course to receive at any proper and convenient stage of the trial in the discretion of the judge, any evidence which the counsel shows will be rendered material by other evidence which he undertakes to produce. If it is not subsequently thus connected with the issue, it is to be laid out of the case. It is further remarked in that case as follows: "It must be apparent that such testimony having once gone to the jury, its impression would necessarily, to some extent, remain in their minds, though they were ordered to dis-

card it; and in a case of circumstantial evidence it is next to impossible to say how far that impression exercised its influence in supplying any defect which might have arisen, or in solving any doubt in their minds on the general state of the evidence. A prosecuting officer in behalf of the State, in his zeal for a conviction, should never overlook the fact that the interests of society and the vindication of the law require at his hands as much the protection of the innocent as the conviction of the guilty. Evidence of this character in cases involving life should never be proposed by him unless he is morally certain that he can make good his promise of connecting the defendant with the matter ; there should be no room for doubt where, as in this case, he could have ascertained in advance the existence or non-existence of the defendant's connection with the proposed evidence." In the Marshall case the trial judge instructed the jury to disregard the illegal evidence when he became satisfied that the prosecution had failed to connect the defendant with it. In the case before us no such instruction was given the jury.

Did counsel for the State in this case fulfill his promise to the court by adducing evidence which proved that defendant, at the time of the murder of his wife, had knowledge that she had been unfaithful to him? If such proof was made, then the testimony objected to was relevant and admissible, but if such proof was not made it was clearly inadmissible and prejudicial to the defendant, and constitutes error, for which the conviction must be set aside. We must presume that the learned and just judge who tried this cause was satisfied from the evidence that the defendant at the time of the murder knew, or believed, that his wife had been unfaithful to him, otherwise the jury would have been instructed to wholly disregard and lay out of the case all the testimony relating to the wife's improper conduct. Knowing, as we well do, the impartiality and profound ability of that eminent judge, we hesitate to disagree with him in his view of the evidence upon this point. But, after a very thorough and careful examination, and consideration of the statement of facts before us, we are forced to the conclusion that the State failed to prove satisfactorily, either directly or circumstantially, that the defendant either knew, or believed, at the time of the murder, that his wife was untrue to him. Some circumstances were proved which tend to show such knowledge or belief on his part, but these circumstances are, to our minds, remote and far from satisfactory.

The proof of this knowledge or belief, in order to have rendered the evidence objected to pertinent and admissible, should have been as certain, satisfactory and conclusive as the proof of other facts necessary to be proved by the State.   Upon the existence of this fact of knowledge or belief depended all the proof of *motive*, and the existence or non-existence of motive was a most important inquiry in the case.   It was the province of the trial. judge to determine the sufficiency of the proof as to defendant's. knowledge or belief of his wife's infidelity, and from the facts before us, we think he should have adjudged proof of such knowledge or belief insufficient, and should have instructed the jury to wholly disregard the testimony relative to the improper conduct of the deceased.   At least, considering the very meagre and unsatisfactory evidence tending to show such knowledge or belief, the jury should have been instructed that, unless they were satisfied from the evidence that defendant did know or believe, at the time of the murder, that his wife was unfaithful to him, they should wholly disregard all the evidence in relation, to the improper conduct and infidelity of deceased.

II.   We must also hold that the testimony of the witnesses,. Highsmith and McCutcheon, as to threats made by the defendant, was inadmissible.   These threats were conditional.   They were that if he knew his wife was. not virtuous, he would kill her and himself too.   They were of but little significance when viewed in the light of the circumstances under which they were made, and were not pertinent evidence to prove motive, unless accompanied by proof that defendant knew that his wife was not virtuous.   They were inadmissible for the same reason that the evidence relating to the wife's conduct has been held to be inadmissible, and   should have been   excluded from the consideration of the jury.

III.   We cannot say that it was error to refuse to compel the prosecution to introduce James Phillips as a witness in the case. We think this was a matter within the sound discretion of the court, and not subject to revision by this court except in a clear case of the abuse of such discretion to the injury of the defendant.   There may be cases in which it would be not only proper, but essential to the ends of justice, to compel the prosecution to. produce witnesses who are shown, by other evidence in the case, to be material.   Such a case, in the opinion of the writer, was. that of Hunnicutt v. The State, 20 Texas Court of Appeals, 636,. in which Presiding Judge White discusses this question, and

expresses his individual views, in which views the writer concurs. In the case before us, it is not made to appear that James Phillips was a material witness; that he knew any facts which would throw light upon the murder. He was not present at the time and place of the murder, and, so far as shown by the other evidence in the case, knew no fact material to the inquiry. It does not even appear likely that James Phillips had a knowledge of any material fact that was not proved by other witnesses.

IV. With regard to the sufficiency of the evidence to support the conviction, we shall refrain from discussion, in. view of the fact that another trial of the case will be had, and on such other trial the evidence may differ materially from that now before us.

Because of the errors committed in the admission of illegal testimony, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered November 10, 1886.