Gary E. WINN, Appellant,

v.

The STATE of Texas, Appellee.

No. 07–95–0169–CR.

Court of Appeals of Texas, Amarillo.

Dec. 30, 1996.

Jan E. Hemphill, Dallas, for appellant.

John Vance, Criminal District Attorney, Dallas (Patricia Poppoff Noble, David Hill and Toby Shook, Assistant Criminal Attorneys), for appellee.

Before DODSON and QUINN, JJ., and REYNOLDS, Senior Justice.*

REYNOLDS, Senior Justice.

Finding appellant Gary E. Winn guilty of the murder of his grandmother Lillian Winn, the victim, a jury assessed his punishment at confinement for 99 years. Contending the trial court erred in admitting evidence that he was the beneficiary of a trust payable on the victim's death, appellant seeks a reversal and new trial. We will affirm.

Although appellant does not challenge the sufficiency of the evidence to support his conviction, a summary of the evidence is appropriate for a positioning of his sole point of error. Ruby Roberts testified, via a videotaped deposition, that for the 15 years preceding the victim's death, she worked on an as-needed basis for the victim, doing odd jobs around the Shawnee Villa Apartments.[1] The victim owned the apartment complex and lived there in quarters adjoining the leasing office. Roberts had lived in the apartments for a number of years and she and the victim had been "like sisters."

Roberts later moved into a house, but she continued to work part-time for the victim, and reported for work on 24 June 1991. She arrived in the victim's kitchen around 8:15 a.m., and the two women visited, drank coffee and planned the day's work. They determined that apartment number 215 needed to be cleaned and painted, and that appellant would assist Roberts in the work.

Appellant had, as he often did, spent the night with his grandmother. When he awoke, she made breakfast for him, and around 9:00 a.m., she, Roberts and appellant went to the storage room to get the cleaning and painting materials. As the victim returned to her office, Roberts and appellant began to clean apartment 215.

Ten to 15 minutes after they began working, Roberts realized she needed a hammer to remove nails from the walls. Appellant left to get a hammer from the storage room and returned in less than 10 minutes with a hammer. She recalled that he was dressed in the same clothes and shoes, and his demeanor had not changed.

As they began to paint, Roberts noted and stated to appellant that the paint was very thin and was not covering the walls. After she mentioned that the victim should know about the inferior paint, appellant excused himself to go to his grandmother's office for a Dr. Pepper, and returned "a few minutes" later with a Dr. Pepper.

With few immaterial variations,[2] appellant's written statement given to the police verified the facts and times recalled by Roberts. Appellant admitted leaving apartment

---

* Charles L. Reynolds, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. § 75.002(a)(1) (Vernon Supp. 1996).

1. Soon after the victim's death, Ruby was diagnosed with terminal cancer and died prior to trial.

2. For example, appellant recalled the number of the apartment they were working in as 115, and mentioned a dog barking in his ear during breakfast, although several witnesses testified the victim did not have a dog.

215 at approximately 9:30 a.m., and retrieving from the storage room the hammer found in apartment 215. The hammer was later tested positive for blood. Appellant admitted to again leaving, around 10:15 a.m., to get a Dr. Pepper from his grandmother's office, where he said that he spoke to her while he was there and that she cautioned him not to get too hot while painting.

Upon appellant's return to apartment 215 with his Dr. Pepper, Roberts suggested they tell the victim that the paint was too thin. Appellant followed Roberts into the kitchen-entrance of the apartment as she called out for the victim. When Roberts proceeded into the living room, appellant remained in the kitchen. At about 10:20 a.m., Roberts found her friend lying in a pool of blood and instructed appellant to telephone for emergency assistance.

The physical evidence revealed that the victim's death was a very violent homicide. When her assailant bludgeoned her head 12 times with a hammer, blood and brain-matter splattered along the walls, furniture and floor of the apartment. The medical examiner testified the lacerations on her head were consistent with having been inflicted by the hammer appellant retrieved from the storage room. Sometime after her death, she was stabbed 18 times in her torso. Citing the state of her congealed blood, expert testimony was that she had to have been attacked at least by 9:30 a.m.

Nancy Webb was the first police officer to arrive at the scene, and found Roberts to be so "out of control," she could not get from her a statement of what had happened. Appellant was calm, cool and collected and related the events to Webb. Webb testified there were no signs of forced entry to, or ransacking in, the apartment, and no signs of sexual assault were seen.

In the presence of Webb and homicide investigator Roger Carney, appellant telephoned his mother. Listening to appellant's portion of the conversation, Webb and Carney observed he had no emotion as he told his mother his grandmother was dead. After a pause, appellant angrily raised his voice and yelled, "Fuck you, bitch," and slammed the receiver down. Carney testified that his investigation revealed the angry statement was prompted by the mother's inquiry whether appellant had anything to do with his grandmother's death. Afterwards, Carney, speaking with appellant, noticed a spot on appellant's shirt which appeared to be, and forensic testing revealed presumptive trace reactions of, blood. ·

Michael Caudillo lived at the Shawnee Villa Apartments and worked part-time for the victim.[3] At approximately 7:00 a.m. on 24 June 1991, he began painting apartment number 217.[4] Around 10:45 a.m., he heard sirens and went to Lillian's apartment to investigate. Caudillo watched the happenings for some time, and around noon, he had a conversation with appellant.

As Caudillo walked over to talk to appellant, he noted that appellant was wearing a different shirt than the one he was wearing earlier when Caudillo saw him painting apartment 215, and appellant seemed "paranoid." Appellant stated to Caudillo that "he needed to get something off his mind, you know, off his chest." Appellant confessed to Caudillo that he hit his grandmother with a hammer, and "[k]ept on striking her."

A few weeks prior to the murder, appellant told Caudillo that he was "going to get rid of his grandmother," which Caudillo understood to mean he intended to kill her. When questioned as to why appellant would want to kill his grandmother, the following exchange between Caudillo and the prosecutor occurred:

A. Because everything was in his name.
Q. Everything what was in his name?
A. What she had.
Q. Talking about the will?
A. Yes.
Q. Did he say that she had some money?

3. At the time of trial in February of 1995, Caudillo was incarcerated on convictions occurring "several years" after the victim's death, resulting in sentences of 65 years for a burglary offense and of 10 years for two robbery offenses.

4. At the time of trial, Caudillo was serving a prison sentence for an unrelated offense, but Carney opined that his statements to the police, which paralleled his testimony at trial, were sufficiently corroborated and were trustworthy.

A. Yes.

Appellant voiced no objection to this testimony.

Witnesses told investigator Carney about seeing two named young men at the apartment complex near the time of the murder; however, none of the witnesses saw the men coming from the victim's apartment. Caudillo reported that appellant told him he paid the two men $200 to knock on the victim's door and run away.

Testimony was adduced that although the victim was wealthy, she worked hard, expected others to work hard, and spent money conservatively. Her adopted son, appellant's father, was not dependable and each Monday, including the day of her death, he got a large sum of money from her. The victim's relationship with appellant was "rocky," an unpleasant one, because she could not get him to work, and there were "a lot of problems" between them.

Frank McLain, attorney for the Estate of Lillian Winn, testified that the estate was worth approximately $1,200,000. The primary beneficiary of the estate was the Gospel Lighthouse Church, which was designated to receive two-thirds thereof, and appellant's father, the victim's adopted son Gary L. Winn, was the named recipient of most of the remainder. There were a few minor bequests, but appellant received nothing under the will.

Over appellant's objections, McLain testified that six months prior to her death, the victim placed a $99,000 certificate of deposit in a revocable trust for appellant's benefit at the age of 18.[5] McLain had no personal knowledge of whether appellant knew of the existence of the revocable trust. McLain explained that a revocable trust allowed the victim to take the certificate of deposit out of the trust at any time during her lifetime. But, since she died without revoking the trust, the money would either continue to be held in trust or a guardian would be appointed to oversee the funds until appellant reached the age of 18. McLain said it would be the position of the administrator of the estate, appellant's father, that appellant could not gain the money if he was found guilty of the victim's murder.

■ Appellant's sole contention of error is that the testimony concerning the certificate of deposit should not have been admitted since he had no knowledge of its existence. He contends on appeal, as he did at trial, that the evidence was irrelevant and its probative value was outweighed by its prejudicial nature. When he made his contention in the trial court, the court heard the matter, deemed the evidence relevant, balanced its probative value against its prejudicial effect, and determined that the unfair prejudice to appellant did not outweigh its probative value.

To be admissible, evidence must be "relevant," i.e., "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R.Crim. Evid. 401. "Evidence which is not relevant is inadmissible." Tex.R.Crim. Evid. 402. Although relevant evidence is admissible, it may be excluded if, among other reasons, its probative value is substantially outweighed by the danger of unfair prejudice. Tex.R.Crim. Evid. 403.

■ Our review of appellant's contention is limited, for the relevancy and prejudicial value of the evidence lie within the sound discretion of the trial court, and the court's ruling will not be disturbed absent a clear abuse of discretion. *Moreno v. State*, 858 S.W.2d 453, 463 (Tex.Cr.App.), *cert. denied*, 510 U.S. 966, 114 S.Ct. 445, 126 L.Ed.2d 378 (1993). Thus, as long as the trial court's ruling was at least within the zone of reasonable disagreement, we will not intercede. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Cr.App.1991). However, when it can be confidently said that by no reasonable perception of common experience that the evidence has a tendency to make the existence of a fact of consequence more or less probable than it would otherwise be, then the trial court abused its discretion to admit the evidence. *Id.*

---

5. Appellant was 16 years old at the time of the murder.

■ In all prosecutions for murder, the State or the defendant is permitted to offer testimony as to all relevant facts and circumstances tending to show the condition of the mind of the accused at the time of the offense. *Sattiewhite v. State,* 786 S.W.2d 271, 294 (Tex.Cr.App.1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 226, 112 L.Ed.2d 181 (1990). Although motive is not an essential element of a crime, evidence of a motive is always admissible because it is relevant as a circumstance tending to prove the commission of an offense. *Bush v. State,* 628 S.W.2d 441, 444 (Tex.Cr.App.1982).

The State offered attorney McLain's testimony of the trust to show a motive for appellant's killing the deceased. In doing so, it was shown that McLain had no personal knowledge that appellant knew about the trust, and the State did not evince either directly or circumstantially that appellant knew about the trust.

■ At least since *Phillips v. State,* 22 Tex.App. 139, 2 S.W. 601 (1886), it has been the Texas rule that evidence showing an accused's motive to murder is admissible only if accompanied by proof satisfactorily showing that, at the time of the murder, the accused had knowledge of the facts constituting the motive. *Id.* at 604. Absent the showing of the accused's knowledge, the evidence is not relevant and is inadmissible. *Id.* at 605. Stated other ways, the rule is that, manifestly, facts unknown to the accused cannot be proven to show motive for a killing, *Berwick v. State,* 116 Tex.Crim. 508, 31 S.W.2d 655, 656 (1930), and that proof of facts not directly or circumstantially shown to be known to the accused at the time of the homicide is not admissible against him to show motive on his part. *Edmondson v. State,* 109 Tex.Cr.R. 518, 6 S.W.2d 119, 120 (1928).[6]

■ Because it was not shown either directly or circumstantially that appellant knew about the trust account, the testimony about it was irrelevant and inadmissible, and the trial court abused its discretion in admitting it. *Montgomery v. State,* 810 S.W.2d at 391. The error requires that we determine its harmfulness. *Id.*; Tex.R.App. P. 81(b)(2).

■ In undertaking the rule 81(b)(2) analysis, we must consider (1) source of the error and (2) its nature; (3) whether the error was emphasized and its probable collateral implications; (4) the weight a juror would probably place upon the error; and (5) whether declaring the error harmless would encourage the State to repeat it with impunity. *Orona v. State,* 791 S.W.2d 125, 130 (Tex.Cr. App.1990). Our attention must be focused on whether the error might possibly have prejudiced the jurors' decision-making in the light of the other evidence, and whether the jurors were able to properly apply the law to the facts in order to reach a verdict. *Harris v. State,* 790 S.W.2d 568, 587–88 (Tex.Cr.App. 1989).

Attorney McLain's testimony of the trust was adduced near the close of the State's evidence at the guilt-innocence stage of the trial and was not mentioned again until the prosecutor made comparatively brief references to it in his arguments to the jury. In his opening argument, the prosecutor, after informing the jury that the State did not have to prove motive, opined there was evidence of motive, stating, "One of those is $99,000. [Appellant] has a revocable trust that he can receive $99,000 upon [the victim's] death. That's one motive."

In response to that part of the argument, appellant's counsel first told the jury, "[W]e have a motive that [appellant] did it for the money. And we have a motive that he did it because he got mad and the paint was too

---

6. The State cites *Bailey v. State,* 532 S.W.2d 316 (Tex.Cr.App.1975), for the holding that evidence revealing the deceased planned to alter her will was relevant and admissible as demonstrating the defendant's motive even without a showing that he knew of the deceased's plans. However, on rehearing, the court, assuming it was error to admit the testimony, found the error, if any, was not sufficient to reverse the cause. *Id.* at 324–25. The dissenting opinion on rehearing contains a plethora of citations adhering to the rule with this comment: "If the circumstances are not known to a defendant, they could not stimulate the emotion causing the defendant to kill the deceased." *Id.* at 325 (Roberts, J., dissenting). The dissent was one of the bases for a later decision of the Court in adhering to the rule in *Jernigan v. State,* 585 S.W.2d 701, 704 (Tex.Cr. App.1979).

thin, he didn't want to work." Then, counsel reminded the jury that, with regard to the money, appellant was not mentioned in the will, and that, "We heard something about a trust account, but no evidence he even knew existed." Counsel then suggested that if a motive based on money was to be looked at, he would look to appellant's father, who "depends on mom for some more, who comes by every Monday morning looking for money," and "[w]ho we know was in danger of being cut off from money."

In his closing argument, the prosecutor rhetorically inquired "what was going on out there," and answered by saying, "We know that there was $99,000 on the line in this case." Notwithstanding, in consideration of the time elements and appellant's movements, the motivational scenario hypothesized by the prosecutor in both of his arguments to a greater extent than reliance on evidence of the trust, was that when appellant retrieved the hammer, he had a confrontation with the victim, at which time his emotions that he did not like to work, that he had problems with his mother and father, and that he wanted the victim's money, erupted and caused him to murder the victim.

So far as the evidence disclosed, appellant was without knowledge of the trust account, but it was evidenced that he believed, mistakenly or not, that upon the victim's death he would inherit her money. Consequently, if the jurors ascribed to appellant a motive to commit murder for money, it logically appears from the evidence that they did so because appellant believed he would inherit the victim's money through her will, not through the trust account of which he had no knowledge. It follows that, in the light of the other evidence, a rational jury would not have credited the evidence of the trust account as a motive for appellant to kill his grandmother.

Resultantly, the first four *Orona* factors militate toward a finding of harmless error. Furthermore, because the source of the error was the trial court's ruling the trust account evidence was admissible, the effect of holding the admission of the evidence harmless provides no encouragement to the State to offer or rely on inadmissible evidence in its prosecution.

Having applied the prescribed standards of review to this prosecution, we conclude beyond a reasonable doubt that the admission of the trust account evidence, albeit erroneous, did not contribute to appellant's conviction or punishment. Appellant's point of error is overruled.

Accordingly, the judgment is affirmed.