**Ronald A. EBY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–04–00080–CR.**

Court of Appeals of Texas,
San Antonio.

April 6, 2005.

Rehearing Overruled May 10, 2005.

Discretionary Review Refused
August 31, 2005.

Steven C. Hilbig, Julie B. Pollock, Hitchings & Pollock, San Antonio, for appellant.

Mary Beth Welsh, Asst. Criminal Dist. Atty., San Antonio, for appellee.

Sitting: CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice.

## OPINION

Opinion by CATHERINE STONE, Justice.

Ronald Eby appeals his conviction and life sentence for murdering Roland Cerv-

era. Because there is factually insufficient evidence to support Eby's conviction, we reverse the trial court's judgment and remand the cause for a new trial.

## BACKGROUND

In April of 1998, Roland Cervera was in the process of purchasing a piece of property in rural southeast Bexar County, Texas. Before the sale of the property was complete, Cervera, with the approval of his realtor, Constance Friesenhahn, began renovating the property. On April 8, 1998, Friesenhahn drove by Cervera's property and noticed Cervera's truck parked near the residence. When Friesenhahn drove by the property again on April 10, 1998, she noticed Cervera's truck had not moved since the last time she drove by the property.

Friesenhahn contacted an adjacent landowner, Bart Moczygemba, to have him check on Cervera. Moczygemba drove to Cervera's property on April 11, 1998. Moczygemba noticed Cervera's truck parked in front of the garage and observed a dog chained to Cervera's truck. Moczygemba, unable to enter the garage due to the dog, peered into the open garage door and saw an interior door ajar.[1] After calling out for Cervera and receiving no response, Moczygemba left the property.

When Friesenhahn drove by Cervera's property on April 12, 1998, she again noticed that Cervera's truck had not moved. Finally, on April 13, 1998, Friesenhahn contacted the Bexar County Constable's Office to check on Cervera. Later that same day, at around 6:00 p.m., Constable Reynaldo Guttierrez met Friesenhahn at Cervera's property.

Upon arriving at the property, Constable Guttierrez smelled a foul odor coming from Cervera's residence and saw flies on an inside window. Guttierrez immediately called for assistance. When his back-up arrived, Guttierrez entered the residence through the open door in the garage. As he did, he observed Cervera's body lying on the ground. Pursuant to standard operating procedure, Guttierrez notified the Bexar County Sheriff's Office to report Cervera's death.

Adrian Ramirez, an Evidence Technician from the Bexar County Sheriff's Office, was dispatched to the crime scene. When Ramirez entered the room where Cervera's body was located, he observed blood splatter and blood smears on the walls, ceiling, curtains, and windows. He also saw Cervera's decomposing body lying on the ground near a wood stove. According to Ramirez, there were bloody footprints throughout the residence.

Authorities conducted a search of Cervera's property and person. The search of Cervera's person revealed a wallet containing his identification and one dollar. The only items collected from inside Cervera's residence were an unopened package of Swisher Sweet cigars, a baseball cap, four unopened cans of Lone Star beer, blood samples, and kitchen tiles with bloody footprints on them. Authorities also processed Cervera's vehicle and recovered the following items: a bottle of Old Milwaukee beer; several empty Lone Star beer cans; and two Church's Chicken boxes containing plastic utensils. The search of Cervera's property revealed a set of keys lying near the front gate of the property. Authorities were unable to locate the murder weapon.

An autopsy of Cervera's body revealed that Cervera died of blunt force trauma to the head. Medical Examiners determined

---

1. The door led from the garage to a closed-off porch. This is where Cervera's body was eventually discovered.

Cervera died anywhere from 48 hours to a week before his body was found. DNA testing performed on genetic material collected from Cervera's finger nails did not produce any evidence for the authorities.

Kenneth Steward was the officer assigned to lead Cervera's murder investigation. Based on Steward's initial observation of the crime scene, he believed one assailant committed the crime and that the crime was not motivated by burglary or robbery. Steward interviewed various residents of the mobile home park where Cervera resided before his death, including Paul Wolds, Marion Hardin, Mary Hardin, and Richard Houghtling. From these interviews, Steward learned that Mary Hardin saw Cervera alive on April 8, 1998 in the presence of Cervera's acquaintance, Alvin Lindblom. According to Hardin, she saw Cervera and Alvin at Cervera's mobile home loading a lawnmower onto a truck. Steward also learned that many of the witnesses were afraid Alvin would retaliate against them for talking to the officer. Based on the information he received from the witnesses, Steward developed Alvin as a murder suspect.

When Steward interviewed Alvin regarding the murder, Alvin denied ever having been to Cervera's property. Alvin told Steward that he had last seen Cervera alive about a week before Cervera's body was discovered. Following his interview with Alvin, Steward proceeded to interview Eby and his wife, Debra Gallego.

Debra informed Steward that she was previously married to Cervera and had one child with him, Timmy. She stated that she was now married to Eby. Debra informed Steward that she had helped Cervera work at his new property all day on April 5 and April 6, 1998. She told Steward that Eby knew she was helping Cervera at the property on those days. Debra also told Steward that Cervera had caught five youths trespassing on his property a couple of weeks before his death, and that the youths had threatened him.

Steward interviewed Eby on April 26, 1998. Eby provided Steward with a written statement denying any knowledge of Cervera's murder. Eby stated that the last time he saw Cervera was in the latter part of 1997, when Cervera came by his residence for Timmy. When questioned regarding his whereabouts from April 5 to April 13, 1998, Eby stated: on April 5, he was with his children until 6:00 p.m., at which time he dropped them off at his grandmother's house. He returned home at 7:30 p.m., where he stayed until the next morning; on April 6, he left for work at 7:45 a.m. and arrived home at 5:10 p.m., where he stayed until the next morning;[2] on April 7th, he left for work at 7:45 a.m. and arrived home at 1:00 p.m. because he felt ill.[3] He remained at home until the next morning; on April 8, he left for work at 7:45 a.m. and arrived home at 5:10 p.m., where he stayed until the next morning; on April 9, 1998, he left for work at 7:45 a.m. and arrived home at 5:45 p.m., where he stayed until the next morning; on April 10, he was at home all day with his wife and son cleaning their house until 8:00 p.m., at which time they left for Canyon Lake. He stayed with his family at Canyon Lake until April 12.[4]

2. Eby's work records indicate that Eby arrived at work two and one half hours late this day because he was registering his son at school.

3. Eby's work records actually indicate Eby left work at 10:30 a.m., not 1:00 p.m.

4. A search of Eby's home and personal vehicles revealed no evidence implicating Eby in Cervera's murder. Officers compared the soles of footwear found in Eby's home with the bloody footprints left at the crime scene. None of the soles of the footwear found in Eby's home matched the bloody footprints.

Steward obtained Eby's work records from Eby's employer, San Antonio Water System. From these records, Steward learned Eby was a field conservation technician. As a field conservation technician, Eby had his own work vehicle and worked unsupervised throughout the day. Steward's search of Eby's work vehicle, however, did not produce any evidence concerning Cervera's murder.

Steward also spoke with the shoe distributor that provides SAWS employees with their footwear. The distributor informed Steward that it sold work boots with tread patterns similar to the imprints found at the crime scene. However, none of the work boots the distributor provided to Eby had such treads. Based on Steward's investigation, both Eby and Alvin were considered potential suspects.

Dalton Baker eventually took over Cervera's murder investigation sometime during 1999. Baker, who was at the crime scene the day Cervera's body was discovered, believed Cervera had been beaten to death by someone using a baseball bat. He began his investigation by reviewing the file prepared by Steward. He also interviewed Alvin Lindblom, Richard Houghtling, Connie Almand, Roland Almand, Mike Neely, John Hardin, Steven Hardin, Billy Bain, Ramiro Cervera, Ronald Lindblom, and Paul Wold. From his interviews, Baker developed Alvin Lindblom as a suspect because Alvin had described the crime scene and Cervera's death in detail to several of the witnesses. Baker's investigation eventually led to Alvin's arrest on May 5, 1999. Alvin was later indicted for Cervera's murder. The case, however, was dismissed on September 6, 2000 for further investigation.

By June of 2002, Jeffrey Robertson of the Texas Rangers had taken over Cervera's murder investigation. When he took over, Robertson reviewed all of the offense reports, witness statements, and crime scene photographs/diagrams. In examining all of the evidence, Robertson concluded one person committed the murder by striking Cervera multiple times in the head with a blunt object.

Robertson stated that he interviewed Mike Neely, Paul Wold, Richard Houghtling, Ronald Lindblom, Eby, and Debra. None of the witnesses provided Robertson with any new information except for Debra, who stated she remembered eating Church's Chicken with Cervera at Cervera's property sometime before his death.[5] Robertson did not re-interview Alvin, Steve Hardin, John Hardin, Mary Hardin, Connie Almand, or Roland Almand.

In November of 2002, the genetic material collected from Cervera's fingernails was subjected to advanced DNA testing procedures. It is unclear whether this DNA evidence was actually collected from underneath Cervera's fingernails. The DNA testing procedures revealed that Eby's DNA matched DNA found on the fingernails. Based on this DNA evidence, Robertson concluded Eby was the perpetrator of the offense. The newly discovered DNA evidence led to Eby's arrest and indictment for murder.

During Eby's trial, multiple witnesses testified for both the State and the defense. Texas Ranger Robertson testified that he considered all of the offense reports, witnesses statements, and other evidence in the case before arresting Eby. He stated he considered that: Alvin indicated to his brother that he may have killed Cervera; Cervera and Alvin were seen together at Cervera's property shortly before the murder; Alvin showed up at Mike

---

5. The witnesses apparently repeated the same information that they had previously given to authorities. Several of the witnesses noted that they were reluctant to talk to the officer because they were afraid of Alvin and his violent disposition.

Neely's home around the time of the murder with blood on his shirt and in possession of a large wad of cash, bragging about beating up a man and taking his money; Alvin was violent and a drug abuser; Alvin smoked Swisher Sweet cigars and drank Old Milwaukee beer; and a baseball bat was missing from the residence where Alvin resided at the time of the murder. According to Robertson, he did not believe there was sufficient evidence indicating Alvin was the murderer.

Robertson explained that he did not believe any of the witnesses' statements implicating Alvin as the perpetrator because he found such statements to be unbelievable. Robertson stated he discredited the statements because they were made after the witnesses had an opportunity to converse about the murder. Robertson conceded, however, that he did not personally interview several of the witnesses he claimed to be unbelievable. Robertson further testified that he excluded Alvin as a suspect when he learned Alvin's DNA did not match any of the DNA found at the crime scene.

Dr. Randall Frost, a forensic pathologist, testified an autopsy of Cervera's body revealed that Cervera died of blunt force trauma to the head. Frost stated that Cervera suffered extensive fracturing to his head and face. He also stated Cervera had several large lacerations on the back of his head and two smaller lacerations on the front of his head. Cervera's body, however, had no other lacerations, broken bones, or other visible injuries. Frost estimated that Cervera's death occurred "anywhere from 48 hours on out to several more days, maybe as much as a week" before his body was found by authorities. He further testified that the perpetrator of the offense could have had Cervera's blood transferred to him or her during the attack.

Jack McElligott, owner of Safety Shoe Distributors, testified his company sold boots with treads capable of making the imprints found at the crime scene. McElligott testified that Eby purchased five different pairs of boots from his company; however, none of the boots had treads capable of making the imprints left at the crime scene.

Henry Amen, a trace evidence expert, testified that the measurement of the bloody shoe impressions left at the crime scene measured 12.1 inches in length. According to Amen, this imprint length translated into a casual or athletic shoe size range of 11 to 12.5.[6] Amen further noted that a 12.1 imprint length would translate into a work boot size range of 8 to 10.[7] Amen stated that he could not specifically identify the size or style of the footwear that left the imprints at the crime scene.

Humberto Ramos, an employee of SAWS, described Eby's job at SAWS. Ramos explained that Eby had a work vehicle and worked unsupervised. According to Ramos, Eby's job required him to travel to different sites throughout San Antonio. He stated Eby typically worked from 7:45 a.m. until 4:30 p.m. Ramos stated records from SAWS reflect that Eby took two and one half hours of leave on April 6, 1998 and five and one quarter hours of leave on April 7, 1998. He also stated Eby filed an accident report on April 14, 1998, claiming he injured his finger while handling a toilet on April 13, 1998.

Dr. Carlos Porter testified he treated Eby for a laceration on his ring finger on April 13, 1998, at around 10:40 a.m. Porter stated Eby's laceration required sutures.

6. Alvin wears a size 11.5.

7. Eby wears a size 9.

He estimated Eby's injury was "definitely less than 24 hours old."

Garon Foster, a technical leader of the forensic serology DNA section at the criminal investigation laboratory, testified about the transfer of DNA between individuals. Foster stated that a person can get DNA on his fingernails from multiple sources, including saliva, the skin from inside the mouth, blood, and semen. According to Foster, DNA can be transferred by a fingernail scratch to an individual's skin; however, the scratch must penetrate into the person's living tissue. Foster also stated DNA can be transferred by a fingernail scratch to an individual's skin if there is genetic material, like saliva, on the surface of the skin.

Foster further explained that DNA can be transferred from one person to another without any direct contact between the individuals. He stated that there is no way to determine if something is secondarily transferred or not. Foster opined that it is possible for DNA to be transferred from a person to a pair of work gloves. For example, Foster indicated that DNA may be transferred from a person to a pair of work gloves if, before the individual puts on the gloves, the person wounds his hand in some way, spits on his hands, or uses his hands to scratch himself. Foster testified that he has documented many instances of secondary DNA transfer in his career.

Ramiro Cervera, Cervera's brother, testified. Cervera introduced him to Alvin Lindblom two weeks before his death. Ramiro stated his brother brought Alvin to his house to borrow a lawnmower. He stated Alvin made him uncomfortable and he did not want Cervera associating with Alvin.

Officer Dalton Baker was called to testify regarding his participation in the murder investigation. Based on his investigation of the crime scene and interviews with approximately ten witnesses, Baker stated he developed Alvin as a suspect. According to Baker, Alvin knew the manner and means of Cervera's death, and consistently described the crime scene and Cervera's death to multiple people. Consequently, Baker concluded Alvin murdered Cervera. He further concluded Alvin committed the murder with a baseball bat. Dalton stated that his investigation led to Alvin's arrest and indictment for Cervera's murder. Dalton admitted that at the time he made his conclusion about Alvin, he did not know Eby's DNA was present on Cervera's fingernails.

Connie Almand, one of Cervera's neighbors, testified that she, along with her daughter and future husband Steven Hardin, lived with her father, Richard Houghtling, before Cervera's death. When Connie and her family moved out of Houghtling's residence, her daughter left behind some of her belongings, including a baseball bat and glove. Alvin moved into Houghtling's residence after Connie and her family moved out. Alvin stayed in Connie's daughter's old bedroom, where her baseball bat was kept. Connie stated she searched for her daughter's baseball bat after learning Cervera may have been murdered with one. She testified that Alvin discovered her looking for the bat and appeared to be worried about "people searching through his stuff." Connie stated she was unable to find her daughter's baseball bat.

Connie also recalled that Alvin and another individual came by her residence one morning at 3:00 a.m. before Cervera's body was discovered. According to Connie, the men were looking for her husband to help them purchase cocaine. Connie noticed that the individual with Alvin had a light red mark on his face, which she described as either a slap mark or an

attempt to rub something off his face. She stated that both Alvin and his companion were drunk and bragging about being in a fight, beating somebody up, and taking all of the person's money. Connie further testified that she remembered seeing Alvin and Paul Wold load a lawn mower onto a trailer, and saw Alvin drive off with the lawnmower. Alvin told Connie that he was helping Cervera clear his property and that Cervera "was going to pay him real good."

Richard Houghtling, one of Cervera's neighbors, testified that he rented a room to Alvin. Houghtling stated that when authorities came looking for Alvin after the murder, Alvin "took off before they got there." He stated that his granddaughter's baseball bat was missing from his residence. Houghtling indicated Alvin had a reputation for drugs and drinking, and he had observed Alvin strung out on cocaine to the point where Alvin did not know what he was doing. Houghtling also stated Alvin had a quick temper, and often appeared "beat up pretty bad." When Alvin learned that Houghtling had talked to the authorities, Alvin threatened to physically harm Houghtling.

Eby testified on his own behalf during trial. He denied murdering Cervera. Eby stated that he knew Debra still spoke with Cervera through a pager and that Cervera had purchased a vehicle for her. According to Eby, he had never personally met Cervera or visited his property. Eby stated that he knew Cervera was purchasing a piece of property so that Timmy could visit with him. He stated he and Debra had some concerns for Timmy's safety at the property due to its poor condition. When Debra went to help Cervera clean the property, she took a pair of his well-worn leather gloves and some of his shop rags with her. Eby never saw his gloves or rags again.

Eby testified that all of his work boots were in his closet at the time the authorities searched his residence. Eby further testified Debra was a beneficiary under Cervera's life insurance policy, but that he did not learn she was a beneficiary until about a year after Cervera's death. Eby could not recall how much insurance proceeds Debra received after Cervera's death. Eby also testified that he declared bankruptcy about six months after Cervera's death.

Debra also testified on Eby's behalf. Debra testified that Cervera knew that she and Eby were married. She stated that although she and Eby were married, she still communicated with Cervera through a pager. Debra testified that Cervera purchased his property to provide a better place for his children. When Debra went to help Cervera clean the property, she took a pair of Eby's gloves and some of Eby's rags with her. Debra testified she used Eby's gloves to clean debris in Cervera's kitchen and that Cervera subsequently used the gloves when he cut some tall grass. Debra indicated that she worked with Cervera on both April 5 and April 6, 1998. When she left Cervera's property on April 6, she did not take Eby's gloves or rags with her, and never saw them again. Debra testified that she did not know she was a beneficiary under Cervera's life insurance policy, and stated she received between $30,000 and $40,000 from the insurance company after his death.

After lengthy deliberations, the jury found Eby guilty of murder. Eby was sentenced to life in prison and this appeal followed.

### SUFFICIENCY OF THE EVIDENCE

### A. Legal Sufficiency Challenge

In his first issue, Eby contends the evidence is legally insufficient to support his conviction. The standard for re-

viewing a challenge to the legal sufficiency of the evidence is the same for both direct and circumstantial evidence cases. *Sutherlin v. State*, 682 S.W.2d 546, 548–49 (Tex.Crim.App.1984). When a party attacks the legal sufficiency of the evidence, we view the evidence in a light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Mason v. State*, 905 S.W.2d 570, 574 (Tex.Crim.App.1995). In our review, we must evaluate all of the evidence in the record, both direct and circumstantial, whether admissible or inadmissible. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App.1999). Although our analysis considers all the evidence presented at trial, we may not re-evaluate the weight and credibility of the record evidence and substitute our judgment for that of the jury. *King v. State*, 29 S.W.3d 556, 562 (Tex.Crim.App.2000); *Dewberry*, 4 S.W.3d at 740. If any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm the trial court's judgment. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex.Crim.App.1997).

After reviewing the evidence in this case, we hold that the evidence is legally sufficient to support Eby's conviction. Eby does not dispute that Cervera was murdered, *see* Tex. Pen.Code Ann. § 19.02 (Vernon 2003); rather, he disputes that he was the person who committed the murder. The record indicates that Eby may have had a motive to kill Cervera. Around the time of the murder, Eby was facing financial troubles that ultimately forced him to declare bankruptcy. Coincidentally, Eby's wife, Debra, was a beneficiary under Cervera's life insurance policy and was scheduled to receive between $30,000 and $40,000 upon Cervera's death. The record also reveals that Eby had an oppor-

tunity to commit Cervera's murder during the time period it is alleged to have occurred, as Eby worked unsupervised throughout the week. The record further reveals that DNA consistent with Eby's DNA was found at the crime scene on Cervera's fingernails. Lastly, Eby's work boot size falls within the range of sizes experts believe could have made the imprints found at the crime scene. Examining all the evidence in the light most favorable to the verdict, we hold any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Eby's first issue is therefore overruled.

## B. Factual Sufficiency Challenge

In his second issue, Eby contends the evidence is factually insufficient to support his conviction. The standard for reviewing a challenge to the factual sufficiency of the evidence is the same for both direct and circumstantial evidence cases. *King*, 29 S.W.3d at 565. When reviewing the factual sufficiency of the evidence, there is only one question to be answered: considering all of the evidence in a neutral light, was a jury rationally justified in finding guilt beyond a reasonable doubt? *Zuniga v. State*, 144 S.W.3d 477, 482 (Tex.Crim.App.2004). There are two ways in which evidence may be factually insufficient. *Id.* "First, when considered by itself, evidence supporting the verdict may be too weak to support the finding of guilt beyond a reasonable doubt. *Id.* Second, there may be both evidence supporting the verdict and evidence contrary to the verdict. *Id.* Weighing all the evidence under this balancing scale, the contrary evidence may be strong enough that the beyond-a-reasonable-doubt standard could not have been met, so the guilty verdict should not stand." *Id.* at 485.

In a factual sufficiency review, we give deference to the jury's determinations, including determinations involving the credibility and demeanor of witnesses. *Cain v. State*, 958 S.W.2d 404, 407 (Tex.Crim.App. 1997). We may not substitute our judgment for that of the jury. *Zuniga*, 144 S.W.3d at 482. Moreover, we will not set aside the judgment unless the jury's verdict was clearly wrong and manifestly unjust, *i.e.*, where the jury's finding "shocks the conscience" or "clearly demonstrates bias." *Id.* at 481.

After reviewing all of the relevant evidence in a neutral light, it is evident that the evidence contrary to the verdict is strong enough such that the beyond-a-reasonable-doubt standard could not have been met in this case. We therefore hold that the evidence is factually insufficient to support Eby's conviction.

The case for the prosecution was entirely circumstantial. The State believed Eby murdered Cervera sometime between the dates of April 6 and April 13, 1998, with a particular emphasis on April 6 and April 7 because Eby took leave from work on those days. The State surmised that Eby murdered Cervera for his insurance proceeds or because Cervera was having an affair with his wife. In support of its case, the State emphasized the fact that DNA consistent with Eby's DNA was found on Cervera's fingernails. The State theorized that this DNA likely came from the finger laceration Eby sought medical treatment for on the day Cervera's body was discovered. The State also emphasized that the length of the bloody footprints found at the crime scene correlate to Eby's work boot size. Lastly, the State noted that Eby purchased his footwear from a company (Safety Shoe Distributors) that sells boots with treads capable of making the imprints found at the crime scene.

With respect to this evidence, there are several points worth noting. First, it was undisputed during trial that witnesses saw Cervera alive as late as April 8, 1998. Second, there is no evidence that Debra and Cervera were having an affair, or if they were, that Eby was aware of the affair. Nor is there any evidence demonstrating that Eby knew Debra was a beneficiary under Cervera's insurance policy at the time of the murder. Third, the record indicates that DNA may be transferred from one person to another without any direct contact between the individuals, including by way of a pair of work gloves. Fifth, the record indicates that the injury Eby sustained to his finger occurred sometime after Cervera's death. The record reveals that Cervera's body was discovered sometime after 6:00 p.m. on April 13, 1998. According to medical testimony, Cervera died anywhere from 48 hours to as long as a week before his body was finally discovered. Eby's injury, however, was less than 24 hours old when he sought treatment for it at 10:40 a.m. on April 13, 1998. Sixth, the witness who testified concerning the length of the footprints left at the crime scene explained that the footprints correspond to either a size 8 to 10 work boot or a size 11 to 12.5 casual/athletic shoe. According to the witness, he could not identify the actual size or style of the footwear leaving the imprints. Lastly, the record indicates that Eby never purchased a pair of work boots from Safety Shoe Distributors with treads capable of making the imprints found at the crime scene.

Besides the aforementioned evidence, the record includes evidence that Cervera was last seen in the presence of Alvin Lindblom, a violent individual with a quick temper. Around the alleged time of the murder, Alvin appeared at several of Cervera's neighbor's homes in possession of a large sum of money, bragging about beating someone up and taking the person's money. One of the neighbors even indicated that Alvin was wearing a bloody

shirt at the time he appeared at his home. In the months following this event, Alvin described the crime scene and Cervera's death to various individuals. In fact, Alvin confessed to his brother that he bludgeoned Cervera with a baseball bat.

Finally, the record includes evidence that Alvin resided with Richard Houghtling at the time of the murder. According to witness testimony, Alvin stayed in a bedroom where a baseball bat was kept. After Cervera's murder was discovered, this baseball bat was discovered missing from Alvin's room. The record indicates that Alvin appeared worried when he discovered "people searching through his stuff" after Cervera's murder. When Alvin learned Houghtling had talked to the authorities about the murder, Alvin threatened Houghtling with physical harm.

In light of the record before us, we must conclude that the evidence contrary to the verdict is strong enough such that the beyond-a-reasonable-doubt standard could not have been met in this case. Because we believe the jury's verdict is clearly wrong and manifestly unjust, we hold there is factually insufficient evidence to support Eby's conviction. *See Zuniga*, 144 S.W.3d at 481. We therefore sustain Eby's second issue.

Although we have determined that the trial court's judgment must be reversed and the cause remanded for a new trial, we deem it advisable to address several additional issues that will undoubtedly confront the trial court on remand.

## HEARSAY EVIDENCE

■ In his third issue, Eby argues the trial court should have admitted the testimony of Officer Dalton Baker, John Hardin, and Ronald Lindblom concerning the out-of-court statements made by Alvin relating to the murder. Neither party disputes that the statements in question are hearsay. Hearsay is inadmissable unless expressly excepted or excluded from the general rule by statute or the rules of evidence. TEX.R. EVID. 802. One such exception is statements against interest. *See* TEX.R. EVID. 803(24). A statement against interest is a statement at the time of its making that was so far contrary to the declarant's interest or so far tended to subject the declarant to criminal liability, a reasonable person in the declarant's position would not have made it unless he believed it to be true. *Id.*

■ For a statement to be admissible under Rule 803(24), two requirements must be met: (1) the statement in question must expose the declarant to criminal liability; and (2) there must be corroborating circumstances that clearly indicate the trustworthiness of the statement. *Bingham v. State*, 987 S.W.2d 54, 57 (Tex.Crim. App.1999). The party seeking admission of the statement has the burden of producing corroborating evidence to prove the trustworthiness of the statement. *Cofield v. State*, 891 S.W.2d 952, 955 (Tex.Crim. App.1994). There is no definitive test to determine whether corroborating circumstances exist for purposes of Rule 803(24). "Any number of factors may be considered in this inquiry, including whether the guilt of the declarant is inconsistent with the guilt of the accused, whether the declarant was so situated that he might have committed the crime, the timing of the declaration and its spontaneity, the relationship between the declarant and the party to whom the declaration was made, and the existence of independent corroborating facts." *Davis v. State*, 872 S.W.2d 743, 749 (Tex.Crim.App.1994).

■ The court is required to consider both circumstances which support as well as those which undermine the reliability of the declarant. *Id.* However, the court is not to "consider the 'credibility of the in-court witness,' since credibility presents an

issue for the jury." *Fonseca v. State,* 908 S.W.2d 519, 522 (Tex.App.-San Antonio 1995, no pet.). "The overriding consideration is that the requirement of corroboration should be utilized and construed in such a manner as to effectuate its purpose of circumventing fabrication." *Cunningham v. State,* 877 S.W.2d 310, 312 (Tex. Crim.App.1994).

Eby's defense at trial was misidentification. In support of that defense, Eby sought to introduce testimony from Officer Baker, John Hardin, and Roland Lindblom, indicating Eby was not the perpetrator of the offense. The trial court, however, sustained the State's objection that this testimony was inadmissible hearsay.

Eby sought to introduce testimony from Officer Baker concerning the statements he obtained from Alvin while Alvin was in police custody. During the first interview with Baker, Alvin denied murdering Cervera or having any knowledge of the murder. Alvin later stated, that if he did commit the crime, he did not remember it because he was "all fired up on cocaine." Alvin admitted that he was in possession of a large sum of money around the time of Cervera's death, but claimed he had borrowed the money from one of his brothers. He later admitted having taken the money from his brother. Alvin stated he had made up the story about beating someone up and taking the person's money in case his brother discovered the missing money.

Alvin also denied having blood on his shirt or attempting to borrow a shirt from one of his neighbors around the time of the murder. He later admitted to having blood on his shirt from butchering an emu. Alvin later changed his story, claiming his shirt was bloody because he had just "beat up a man." Alvin, however, again changed his story, claiming he tore his shirt himself to make it look as though he had been in a fight. Alvin told Baker that he smoked Swisher Sweet cigars and drank Old Milwaukee beer.

Eby also sought to introduce the testimony of John Hardin concerning statements Alvin made to him in November of 1998. According to Hardin, Alvin told him that an individual had hired Alvin, Alvin's brother (Ronnie), and Clay Holsten to renovate a piece of property the individual was in the process of purchasing. When the three men went to the property to drop off a lawnmower, Alvin allegedly killed the guy with a baseball bat and stole a large sum of money from the guy. Alvin revealed that he "beat the shit out of [the guy] and crushed his face." Alvin also stated "he beat the guy so bad that the floors, walls, and ceiling [were] covered in blood."

After the men left the individual's property, Alvin returned to his trailer park to get a clean shirt because his was covered in blood. Alvin attempted to borrow a shirt from one of his neighbors but the neighbor refused to loan him one. Alvin subsequently met up with his friend Benny McBain and attempted to purchase cocaine from one of Alvin's neighbors. Hardin stated that Alvin burned his clothing and painted his truck white to hide it after the murder.

In addition, Eby sought to introduce the statements of Roland Lindblom concerning Alvin's prior statements about Cervera's death.[8] Sometime around the end of April 1998, Alvin told Roland that he had repaired a lawnmower for Cervera. When

8. Defense counsel subpoenaed Roland to testify, but he did not appear. Counsel advised the court that he would seek a writ of attachment for Roland if the court would allow his testimony. Because the court sustained the prosecution's objection to Roland's testimony, defense counsel introduced a written statement from Roland to demonstrate the nature of the testimony he sought to introduce through the witness.

Alvin returned the lawnmower to Cervera, Alvin, along with an individual named McBain, hit Cervera in the head with a baseball bat. Alvin and McBain took Cervera's money after they knocked him out with the baseball bat. After the incident, Alvin painted the truck he used to tow the lawnmower to Cervera's property white.

It is beyond question that the statements Alvin made to Officer Baker, Hardin, and Roland implicated Alvin in Cervera's murder, and thus tended to expose him to criminal liability. The pertinent inquiry then is whether corroborating circumstances clearly indicate the trustworthiness of the statements. *See Bingham,* 987 S.W.2d at 57. Here, it appears that there are corroborating circumstances indicating the trustworthiness of the statements.

First, the investigating officers in this case revealed that they believed only one person committed Cervera's murder, citing the fact that there was only one set of bloody footprints at the crime scene. Alvin's confession of guilt was therefore inconsistent with the guilt of anyone else, including Eby, because only one person could have committed the crime. Second, the record reveals that Alvin was known to be working for Cervera at the property Cervera was purchasing. Alvin was seen in Cervera's presence on multiple occasions, including April 8, 1998, a date right around the time the murder was alleged to have occurred. Alvin was thus situated to have committed Cervera's murder. Third, the majority of Alvin's statements were made at a time when the police were still investigating who had committed Cervera's murder.[9] Fourth, the majority of Alvin's statements were spontaneous and

made to either a relative or a criminal acquaintance not connected with the commission of the alleged offense.[10]

Finally, Eby developed independent corroborative facts that verified the reliability of Alvin's statements to Officer Baker, Roland, and Hardin. In the alleged statement to Officer Baker, Alvin admitted possessing a large sum of money and appearing at one of his neighbor's houses with blood on his shirt around the time of the murder. The evidence in the record reveals that Alvin and another individual appeared at Connie Almand's residence one morning bragging about stealing someone's money. The record also reveals that Mike Neely, one of Alvin's neighbors, told authorities Alvin appeared at his house one night around the time of the murder wearing a bloody shirt, bragging about beating someone up and taking the person's money.

Alvin's alleged statements to Roland and Hardin about striking Cervera with a baseball bat are consistent with the physical evidence, as Cervera's head injuries were consistent with being struck with a blunt object like a baseball bat. The statements are further corroborated by the fact that Alvin told multiple people that he struck Cervera in the head with a baseball bat and stole his money.

In the alleged statements to Hardin, Alvin described the extent of the blood splatter on the floors, walls, and ceiling; indicated that he appeared at one of his neighbor's houses wearing a bloody shirt; and indicated that he went to his trailer park after the murder to purchase cocaine. The evidence in the record reveals Alvin's statements regarding the crime scene blood splatter were consistent with the

---

9. Alvin made his statements to Roland several weeks after the murder and his statements to Hardin approximately six months after the murder.

10. Roland was Alvin's brother while Hardin was Alvin's former cell mate.

physical evidence. The evidence also reveals that Alvin appeared at Connie Almand's residence one morning around the time of the murder looking for her husband to purchase cocaine.[11] Lastly, as previously discussed, the record indicates Alvin appeared at Mike Neely's house around the time of the murder wearing a bloody shirt.

The record, however, also includes evidence indicating some of Alvin's statements may be untrustworthy. Alvin's statements to Hardin were made at a time when Alvin was allegedly intoxicated and his statements to Baker were made in response to police interrogation. Also, Alvin's statements to Roland and Hardin were inconsistent regarding who accompanied Alvin when he went to Cervera's property. The record indicates that Roland alleges McBain was with Alvin at the time of the murder, while Hardin alleges Ronnie Lindblom and an individual named Clay were with Alvin. Further, no murder weapon was ever recovered in this case, so it is unclear whether a baseball bat was in fact the weapon used to bludgeon Cervera.[12]

Considering the relevant factors, it appears the corroborating evidence, even in light of evidence tending to undermine the trustworthiness of Alvin's statements, is sufficiently convincing to indicate trustworthiness. Alvin's statements to Officer Baker, Roland, and Hardin, if believed, could create a reasonable doubt as to Eby's guilt. Thus, the trial court acted outside the zone of reasonable disagreement when it excluded the statements in question.

### MOTIVE

 In his fourth issue, Eby argues the trial court erred by admitting testimony regarding Cervera's life insurance policy to establish a motive for Cervera's murder. Eby maintains that without proof he knew his wife was a beneficiary under the policy, such evidence was irrelevant and inadmissible against him.

 Evidence showing an accused's motive to murder is admissible as relevant evidence. *Miranda v. State*, 813 S.W.2d 724, 733 (Tex.App.-San Antonio 1991, pet. ref'd). However, such evidence is admissible only if accompanied by proof showing that, at the time of the murder, the accused had knowledge of the facts constituting the motive. *Jernigan v. State*, 585 S.W.2d 701, 704 (Tex.Crim.App.1979); *Winn v. State*, 937 S.W.2d 124, 128 (Tex. App.-Amarillo 1996, no pet.). Thus, "facts unknown to the accused cannot be proven to show motive for a killing, and that proof of facts not directly or circumstantially shown to be known to the accused at the time of the homicide is not admissible against him to show motive on his part." *Winn*, 937 S.W.2d at 128.

Here, while Eby was testifying, the prosecution was permitted, over defense

---

11. Defense counsel introduced an additional written statement from Steve Hardin during trial to demonstrate the reliability of Alvin's statements to John Hardin. According to Steve's statement, Alvin appeared at his residence one morning with an individual named McBain looking to purchase cocaine. When he was there, Alvin stated he "whooped up on this guy with a bat and took his money." Alvin further indicated that the person whom he beat had hired him to clean brush at a piece of property in the country.

12. The State also points out that the proffered evidence was unreliable because the statements were not conveyed to authorities until almost a year after the murder and there was a great deal of media attention in the case. These contentions, however, relate to the credibility of the testifying witnesses. The court of criminal appeals has indicated that the credibility of in-court witnesses presents an issue for the jury, not this court or the trial judge. *See Cunningham*, 877 S.W.2d at 312.

counsel's objection, to develop testimony regarding Cervera's life insurance policy.

Q. And when did you find out Debra was still a beneficiary on [Cervera's] life insurance?

A. It was well after the fact. After he was—after he was found.

Defense Counsel: Judge, we're going to object to the relevance of this line of questioning.

The Court: Overruled.

Q. Well, after the fact. After [Cervera] was murdered you found out that she was still a beneficiary on his life insurance?

A. I found out about a year later.

Q. A year later. And how much did you all collect on him?

A. I have no—

Defense Counsel: Your Honor, we're going to object to all of this line of questioning. May we approach, Your Honor? (At the bench)

Defense Counsel: Judge, this is the exact evidence that the Court has indicated was entirely inadmissible without showing that he knew. And now she has stated as an absolute fact that they did collect insurance, and is going into the amount of insurance, in total violation of the motion in limine that this Court has already entered. And we move for a mistrial on this basis, that the prosecution has injected before this jury evidence of motive that this Court had heretofore excluded. And we object that it is highly prejudicial, violation of the limine, and the State was specifically instructed not to go into any of that without laying the proper predicate. They have laid no predicate whatsoever, and they have now injected it before this jury, both the affair and the insurance.

The Court: Overruled. (End of bench discussion).

Q. How much did you collect on the insurance?

A. I don't recall.

Q You don't recall?

A. No, I do not, ma'am.

Q. Well, isn't it true that it was over $300,000?

A. I never saw that amount of money in my life, ma'am.

Q. Okay. And, in fact, you actually shortly after the murder filed for bankruptcy; isn't it true?

Defense Counsel: Object to relevance.

Prosecution: Judge, it goes to financial motive.

Defense Counsel: Again, Your Honor, this is exactly why we are making this objection, is that she is attempting to put before this jury a motive unknown to the defendant.

The Court: Overruled. Overruled.

Q. Isn't it true that you filed for bankruptcy shortly after this murder occurred?

A. Yes. In October of 1998.

Q. In October of 1998. When did you all collect on the insurance?

A. We didn't get it until sometime in '99, after—well after April. It was after the arrest of Lindblom.

Q. After the arrest of Lindblom—

A. Yes.

Q. —that's when you got it? And were you aware that [Cervera] continued to carry Debra on his health insurance as a spouse?

Defense Counsel: I'm going to object. That calls for hearsay, Judge. There's no evidence before this jury. Object, it calls for hearsay.

Prosecution: If he knew, Judge. I'm asking if he knew.

Defense Counsel: It assumes a fact—

The Court: Overruled.

Defense Counsel: Well, Judge, we're going to have running line of objections so I don't have to object to every line of question where this prosecutor is phrasing the question that assumes a fact not in evidence, which they have not put any evidence before this jury through any witness. It's calling—

The Court: The specific question, you[r] specific question objection as to that question is overruled. Let's move on.

Q. Do you know?

A. No, I don't.

Q. Would it surprise you to know that the human resources person was under the impression that they were still married—

Defense Counsel: I object. It calls for speculation.

The Court: Sustained as to that question.

Defense Counsel: Be instructed to— Ask the jury be instructed to disregard the statements of counsel in terms of what the person was surprised or otherwise surprised as far as her statement.

The Court: Ladies and gentlemen, please remember what the attorneys say in this case is not evidence. You may proceed.

Q. Were you—

Defense Counsel: And we also move for a mistrial in that regard, Judge.

The Court: Denied.

Before cross-examining Debra, the prosecution informed the trial court that it intended to ask Debra all the same things it had asked Eby. Defense counsel objected as follows:

And we have the same objection that we did to the defendant's statements. That I object—the record is clear what I'm objecting to, to anything about insurance, anything about this affair. There's no way to connect it to the defendant. The State is aware that they have no witness that could show the defendant knew. And we object to the Court allowing any questioning, even do you know or have you heard, because of the injection of this material before the State—before this jury as a matter of fact, and that's the way the questions are being presented, which is clear from the way she questioned the defendant, did you know that the family was in shock, that assumes a fact, and did you know about the insurance.

The Court: I believe I sustained your objection to that question.

Defense Counsel: That particular one, but the whole line of questioning Judge, is what we're objecting to.

The Court: Unless I know specifically what the question is and specifically what the objection is, I can't rule. So go ahead.

The prosecution proceeded to cross-examine Debra as follows:

Q. Ma'am, you were listed as a beneficiary on [Cervera's] life insurance, weren't you?

A. I had no idea until the insurance contacted me.

Q. They contacted you?

A. Yes, ma'am.

Q. So you did not contact them two weeks after the murder and ask them when you were receiving your money?

A. No, ma'am, I did not.

Q. Okay. And were you still listed as a spouse on [Cervera's] health insurance, weren't you?

Defense Counsel: Same objection, Judge. It calls for hearsay and assumes matters not in evidence.

Prosecution: If she knows, Judge.

The Court: She can answer if she knows.

The Witness: Could you repeat the question, ma'am?

Q. Were you listed as a spouse on [Cervera's] health insurance?

A. I'm not—I don't know.

Q. You don't know—

A. No, ma'am.

Q. —that he was still carrying you and Timothy?

Defense Counsel: Same objection. She's testifying as if this is a fact, Judge. There's no evidence before the jury, now she's arguing with her.

The Court: Let's move on.

Defense Counsel: Objection to her statements, Your Honor.

The Court: Sustained. Let's move on.

\* \* \*

Q. How much money did you collect on the life insurance of Roland Cervera?

A. I don't recall off the top of my head the exact amount, because [Cervera]—

Q. Was it over a hundred thousand?

A. No, ma'am.

Q. How much was it?

A. It was 30 or $40,000, ma'am.

\* \* \*

Q. Okay. And Roland also had accidental death insurance, didn't he?

A. I don't know ma'am.

Q. You don't know. Well, you collected it.

A. I just got what the insurance sent, ma'am.

In the underlying proceeding, the State wholly failed to present any evidence, direct or circumstantial, that Eby had any knowledge that his wife was a beneficiary under Cervera's life insurance policy. Without such evidence, the insurance motive evidence was irrelevant and should have been excluded from the consideration of the jury by the trial court. *See Jernigan,* 585 S.W.2d at 704 (holding evidence of a wife's extramarital relationship was not admissible to show motive because it was never established that the defendant-husband was aware of the relationship); *Winn,* 937 S.W.2d at 128 (holding evidence concerning victims' trust account was not admissible to show motive because the State never demonstrated the defendant had any knowledge that he was a beneficiary of the trust). Upon another trial, however, the State should be given the opportunity to prove, if it can, that Eby had knowledge his wife was a beneficiary under Cervera's life insurance policy at the time of the murder.

### IMPROPER CROSS EXAMINATION QUESTIONS

▇▇▇▇ In his fifth issue, Eby argues the trial court erred by allowing the prosecution to cross-examine him about a possible affair between Debra and Cervera.[13] A defendant who exercises his right to testify is subject to the same rules governing examination and cross-examination as any other witness, whether he testifies at the guilt-innocence stage or at the punishment stage of the trial. *Felder v. State,* 848 S.W.2d 85, 99 (Tex.Crim.App.1992). The scope of cross-examination of a defendant is wide open. *Id.* Once the defendant testifies at trial, he opens himself up to questioning by the prosecutor on any sub-

---

**13.** The improper questions were asked but not answered by Eby because the trial court sustained defense counsel's objections to the questions. Eby also complains that the trial court erred by allowing the State to cross- examine his wife on the same subject. She, like Eby, did not answer the questions posed because defense counsel's objections to the questions were sustained by the trial court.

ject matter that is relevant. *Id.* However, "the prosecution cannot attempt to establish a theory of [the defendant's] actions by questions alone, with no basis in fact. Nor may the prosecution attempt to get before the jury, indirectly through [its] cross-examination, evidence in which the subject matter is inadmissible." *Hartman v. State,* 507 S.W.2d 553, 556 (Tex.Crim. App.1974).

In the instant case, the State's line of questioning was irrelevant because the State failed to introduce any direct or circumstantial evidence that Eby had any knowledge of an affair between his wife and Cervera. Therefore, it was improper for the State to explore the marital affair subject when it had no basis in fact for the inquiry. Once again, however, the State should be given the opportunity at the new trial to show, if it can, any relationship between Eby, Debra, and Cervera which would shed light on Eby's motives and intent to kill Cervera.

## CONCLUSION

Based on the foregoing, the judgment of the trial court is reversed and the cause is remanded for further proceedings consistent with this opinion.